No. 22-51078

# United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff–Appellant,*

*v.*

SAMUEL ADAM SANCHEZ-TENA,

*Defendant–Appellee.*

Appeal from the United States District Court
for the Western District of Texas
No. 7:22-CR-160-DC

## APPELLANT'S BRIEF FOR THE UNITED STATES

JAIME ESPARZA
United States Attorney

CHARLES E. FOWLER, JR.
Assistant United States Attorney
Western District of Texas
903 San Jacinto, Suite 334
Austin, Texas 78701
Phone: (512) 370-1265
Fax: (512) 916-5854

**RECOMMENDATION ON ORAL ARGUMENT**

Oral argument is unneeded. The sole question presented is whether 18 U.S.C. § 922(n), the federal statute prohibiting receipt of a gun while under felony indictment, facially violates the Second Amendment. The government anticipates that this Court will answer that question in another pending appeal, *United States v. Quiroz*, No. 22-50834 (5th Cir.). The government expects the decision in *Quiroz* to control here, so that oral argument would not significantly help this Court decide the case. *See* Fed. R. App. P. 34(a)(2)(C).

# TABLE OF CONTENTS

RECOMMENDATION ON ORAL ARGUMENT.............................i

TABLE OF CONTENTS ........................................ ii

TABLE OF AUTHORITIES................................... iv

JURISDICTION .................................................. 1

STATEMENT OF THE ISSUE ................................... 1

STATEMENT OF THE CASE ................................... 1

    I.    To promote public safety, § 922(n) bars receiving a gun while under felony indictment. ...............................................1

    II.   Sanchez obtained a pistol while under felony indictment for aggravated robbery. ...........................................3

    III.  Sanchez pled guilty to receiving a gun while under felony indictment. ................................................3

    IV.  The Supreme Court clarified the standard for Second Amendment claims in *Bruen*. ...................................3

    V.   Relying on *Bruen*, the district court dismissed the § 922(n) charge in *United States v. Quiroz*. .............................4

    VI.  Adopting its *Quiroz* order, the district court dismissed the charge against Sanchez.........................................6

SUMMARY OF THE ARGUMENT ............................. 7

STANDARD OF REVIEW .................................... 11

ARGUMENT ............................................... 11

    I.    Section 922(n) is constitutional under longstanding Supreme Court precedent letting the government restrict indicted defendants' rights. .................................11

II.   The Second Amendment's plain text does not cover receiving guns while under felony indictment. ...................... 15

    A.   The Second Amendment's text codified a preexisting right that covered only law-abiding citizens. ................. 16

    B.   Indicted felony defendants are not law-abiding citizens covered by the Second Amendment's text. ........ 24

III.   Section 922(n) squares with the nation's historical tradition of gun regulation. ................................................ 27

    A.   Section 922(n) is analogous to historical liberty restrictions on the accused............................................. 31

    B.   Section 922(n) is analogous to historical laws disarming dangerous or untrustworthy people............... 41

IV.   At minimum, § 922(n) is constitutional as applied to Sanchez, a question the district court did not reach............... 48

CONCLUSION ............................................................... 51

CERTIFICATE OF SERVICE ............................................... 52

CERTIFICATE OF COMPLIANCE ........................................ 52

## TABLE OF AUTHORITIES

### Cases

*Agnello v. United States,*
  269 U.S. 20 (1925).............................................................................40

*Barrett v. United States,*
  423 U.S. 212 (1976)........................................................................... 2

*Battles v. United States,*
  No. 4:23-CV-00063-HEA (E.D. Mo. Jan. 20, 2023)...........................21

*Bell v. Wolfish,*
  441 U.S. 520 (1979)..................................................................... 13, 15

*Buchanan v. Alexander,*
  919 F.3d 847 (5th Cir. 2019)...........................................................49

*Bucklew v. Precythe,*
  139 S. Ct. 1112 (2019) ....................................................................33

*Carlson v. Landon,*
  342 U.S. 524 (1952)........................................................................32

*Cases v. United States,*
  131 F.2d 916 (1st Cir. 1942) ........................................................... 2

*Chimel v. California,*
  395 U.S. 752 (1969)........................................................................40

*District of Columbia v. Heller,*
  554 U.S. 570 (2008)............................................................... passim

*Estelle v. Williams,*
  425 U.S. 501 (1976)........................................................................15

*Ex parte Milburn,*
  9 Pet. 704 (1835)............................................................................31

*Furman v. Georgia,*
  408 U.S. 238 (1972)........................................................................33

*Gerstein v. Pugh,*
  420 U.S. 103 (1975)..................................................................... 12, 13

*Kaley v. United States,*
  571 U.S. 320 (2014)...........................................................11, 35, 36

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010)..............................................................17

*Medina v. Whitaker,*
    913 F.3d 152 (D.C. Cir. 2019) ...............................................22, 33, 44

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco,
Firearms, & Explosives,*
    700 F.3d 185 (5th Cir. 2012)........................................... 28, 42, 43, 44

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) ...............................................................passim

*People v. McLeod,*
    3 Hill 635 (N.Y. 1842) ...............................................................35

*People v. Tinder,*
    19 Cal. 539 (1862)......................................................................35

*Range v. Att'y Gen.,*
    53 F.4th 262 (3d Cir. 2022) .......................................................passim

*Robertson v. Baldwin,*
    165 U.S. 275 (1897).....................................................................16

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.,*
    490 U.S. 477 (1989).....................................................................14

*State v. Buzzard,*
    4 Ark. 18 (1842)..........................................................................41

*State v. Hill,*
    1 Tread. 242 (S.C. 1812) .............................................................35

*State v. Mills,*
    2 Dev. 420 (N.C. 1830) ...............................................................35

*Taylor v. Kentucky,*
    436 U.S. 478 (1978).....................................................................15

*Taylor v. Taintor,*
    83 U.S. 366 (1873).......................................................................39

*Tennessee v. Garner,*
    471 U.S. 1 (1985) ........................................................................33

*The Territory v. McFarlane,*
    1 Mart.(o.s.) 216 (Orleans Super. Ct. 1811) .................................35

*United States v. Avila,*
  No. 22-50088 (5th Cir. Dec. 21, 2022) ................................................ 9

*United States v. Bartucci,*
  No. 119CR00244ADABAM (E.D. Cal. Feb. 23, 2023) ............ 8, 30, 47

*United States v. Bena,*
  664 F.3d 1180 (8th Cir. 2011) ........................................................... 46

*United States v. Black,*
  No. CR 22-133-01 (W.D. La. Jan. 6, 2023) ....................................... 21

*United States v. Carpio-Leon,*
  701 F.3d 974 (4th Cir. 2012) ............................................................. 45

*United States v. Charles,*
  No. MO:22-CR-00154-DC (W.D. Tex. Oct. 3, 2022) ......................... 30

*United States v. DaSilva,*
  No. 3:21-CR-267 (M.D. Penn. Nov. 23, 2022) .................................. 17

*United States v. Edwards,*
  430 A.2d 1321 (D.C. 1981) ............................................................... 32

*United States v. Fencl,*
  No. 21-CR-3101 JLS (S.D. Cal. Dec. 7, 2022) ................. 22, 26, 30, 36

*United States v. Garcia,*
  No. 22-50314 (9th Cir. Jan. 26, 2023) ............................................... 26

*United States v. Gore,*
  No. 2:23-CR-04 (S.D. Ohio Feb. 21, 2023) .................................. 8, 30

*United States v. Grant,*
  No. CR 3:22-161-MGL-1 (D.S.C. Oct. 28, 2022) .............................. 22

*United States v. Grinage,*
  No. SA-21-CR-00399-JKP (W.D. Tex. Dec. 5, 2022) ................... 22, 42

*United States v. Howard,*
  766 F.3d 414 (5th Cir. 2014) ............................................................. 11

*United States v. Hunter,*
  No. 1:22-CR-84-RDP-NAD-1 (N.D. Ala. Dec. 13, 2022) ................. 22

*United States v. Jackson,*
  No. CR ELH-22-141 (D. Md. Feb. 27, 2023) ............................ passim

*United States v. Jimenez-Shilon,*
   34 F.4th 1042 (11th Cir. 2022)...........................................................17

*United States v. Kays,*
   No. CR-22-40-D (W.D. Okla. Aug. 29, 2022) ...............................8, 30

*United States v. Kelly,*
   No. 3:22-CR-00037 (M.D. Tenn. Nov. 16, 2022).......................passim

*United States v. Laurent,*
   861 F. Supp. 2d 71 (E.D.N.Y. 2011)........................................ 1, 2, 47

*United States v. Lewis,*
   No. CR-22-368-F (W.D. Okla. Jan. 13, 2023)..................................29

*United States v. McGinnis,*
   956 F.3d 747 (5th Cir. 2020)............................................................48

*United States v. Medrano,*
   No. 3:21-CR-39 (N.D.W. Va. Jan. 6, 2023) ................................ 22, 25

*United States v. Morrison,*
   No. 22-10570 (5th Cir. Mar. 6, 2023).................................................. 9

*United States v. Now,*
   No. 22-CR-150 (E.D. Wis. Mar. 15, 2023) ......................... 8, 15, 27, 30

*United States v. Nutter,*
   No. 2:21-CR-00142 (S.D.W. Va. Aug. 29, 2022)..............................29

*United States v. Perez-Garcia,*
   No. 22-CR-1581-GPC (S.D. Cal. Dec. 6, 2022)................................30

*United States v. Perry,*
   788 F.2d 100 (3d Cir. 1986).............................................................32

*United States v. Posada,*
   No. EP-22-CR-1944(1)-KC (W.D. Tex. Apr. 20, 2023)...............passim

*United States v. Rahimi,*
   61 F.4th 443 (5th Cir. 2023) ....................................................passim

*United States v. Rene E.,*
   583 F.3d 8 (1st Cir. 2009)................................................................46

*United States v. Rowson,*
   No. 22 Cr. 310 (PAE) (S.D.N.Y. Jan. 26, 2023) ................. 8, 30, 35, 47

*United States v. Salerno*,
  481 U.S. 739 (1987) ........................................................ 12, 26, 27, 49

*United States v. Sanchez*,
  No. W-21-CR-00213-ADA (W.D. Tex. Dec. 19, 2022) ................. 22, 25

*United States v. Seiwert*,
  No. 20 CR 443 (N.D. Ill. Sept. 28, 2022) .......................................... 26

*United States v. Simien*,
  No. SA-22-CR-00379-JKP (W.D. Tex. Feb. 10, 2023) .................... 8, 30

*United States v. Simmons*,
  47 F. 575 (C.C.S.D.N.Y. 1891) ......................................................... 38

*United States v. Sitladeen*,
  64 F.4th 978 (8th Cir. 2023) ............................................................. 21

*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010) ........................................................ 1, 44

*United States v. Slye*,
  No. 1:22-MJ-144 (W.D. Penn. Oct. 6, 2022) .................... 31, 32, 36, 37

*United States v. Smith*,
  No. CR 122-081 (S.D. Ga. Mar. 29, 2023) ................................ passim

*United States v. Stennerson*,
  No. CR 22-139-BLG-SPW (D. Mont. Feb. 24, 2023) .............. 8, 30, 47

*United States v. Stephens*,
  594 F.3d 1033 (8th Cir. 2010) ................................................ 13, 32, 35

*United States v. Vongxay*,
  594 F.3d 1111 (9th Cir. 2010) .................................................... 23, 45

*United States v. Wendt*,
  No. 422CR00199SHLHCA1 (S.D. Iowa Jan. 11, 2023) .............. 14, 50

*United States v. Williams*,
  No. 22-10129 (5th Cir. Mar. 3, 2023) ................................................. 9

*United States v. Yancey*,
  621 F.3d 681 (7th Cir. 2010) ............................................................. 45

*United States v. Young*,
  No. CR 22-054 (W.D. Pa. Nov. 7, 2022) ........................................... 22

*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008) .................................................................. 49, 50

*Weeks v. United States*,
232 U.S. 383 (1914) ......................................................................40

*Wrenn v. District of Columbia*,
864 F.3d 650 (D.C. Cir. 2017) .........................................................39

*Young v. Hawaii*,
992 F.3d 765 (9th Cir. 2021) ...........................................................39

**Federal Statutes**

18 U.S.C. § 922 .................................................................. passim

18 U.S.C. § 3142 ............................................... 12, 27, 30, 36

18 U.S.C. § 3231 ................................................................. 1

18 U.S.C. § 3731 ................................................................. 1

**Other Authorities**

1 Acts and Resolves, Public and Private, of the Province of
the Massachusetts Bay (1869) ...........................................................42

1 David Robertson, *Reports of the Trials of Colonel Aaron Burr*
(1808) ........................................................................................34

1 Laws of the State of North Carolina, including the Titles
of Such Statutes and Parts of Statutes of Great Britain as
Are in Force in Said State (1821) ......................................................42

2 Bernard Schwarz, The Bill of Rights: A Documentary
History (1971) ...............................................................................45

2 Matthew Hale, *The History of the Pleas of the Crown* (1736) ..............38

2 William Hawkins, *A Treatise of the Pleas of the Crown* ch. 15,
§ 84 (6th ed. 1787) .........................................................................39

3 William Blackstone, *Commentaries on the Laws of England*
(1765) ..................................................................................... 37, 38

4 William Blackstone, *Commentaries on the Laws of England*
(1769) ..................................................................................... 38, 40

A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time (1836)............................................43

Act of Sept. 24, 1789, ch. XX, 1 Stat. 73, § 33 (1789) ..........................33

Acts and Laws of His Majesty's Province of New Hampshire in New England; with Sundry Acts of Parliament (1771) ............................................................42

Anthony Highmore, *A Digest of the Doctrine of Bail in Civil and Criminal Cases* (1783) ....................................................31

Ariz. Rev. Stat. § 13-3112 ....................................................20

Charles Petersdorff, *A Practical Treatise on the Law of Bail in Civil and Criminal Proceedings* (1824).....................................39

Clara Kalhous, *et al.*, *Bail Pending Trial, Changing Interpretations of the Bail Reform Act & the Importance of Bail from Defense Attorneys' Perspective*, 32 Pace L. Rev. 800 (2012)...........................................................31

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force (1794) ............................................................43

Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143 (1986)........................................46

Donald B. Verrilli, Note, *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328 (1982)...............34

Edward Coke, *A Little Treatise of Baile and Maineprize* (2d ed. 1637)............................................................38

Federal Firearms Act of 1938, ch. 850, § 2(f), 52 Stat. 1250 ..................2

George Webb, The Office and Authority of a Justice of Peace (1736) ............................................................42

John F. Duffy & Richard M. Hynes, *Asymmetric Subsidies and the Bail Crisis*, 88 U. Chi. L. Rev. 1285 (2021) ....................................38

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249 (2020) ............................................................41

Joyce Lee Malcolm, To Keep and Bear Arms (1994) ..........................44

Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 91......................................34

Ky. Rev. Stat. § 237.110........................................................................20

La. Stat. § 40:1379.3 .............................................................................20

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139 (2007) ..........................44

S. Rep. No. 82, 75th Cong., 1st Sess. 2 (1937) ...................................... 2

Sandra G. Mayson, *Dangerous Defendants*, 127 Yale L.J. 490 (2018)..............................................................................................32

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) ....................................................................................44

Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657 (2002) ....................................................................................46

Tenn. Code § 39-17-1351........................................................................20

Tex. Penal Code § 29.03.......................................................................... 3

Thomas F. Davidson*, The Power of Courts to Let to Bail*, 24 Am. L. Reg. 1 (1876) .......................................................................34

Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union (1st ed. 1868) ...................................45

William Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb. L. Rev. 33 (1977)..............................................................................32

William Rawle, A View of the Constitution of the United States of America (2d ed. 1829)........................................................40

## Federal Rules

Fed. R. App. P. 32 .............................................................................52

Fed. R. App. P. 34 ............................................................... i

Fed. R. App. P. 4 ............................................................... 1

## JURISDICTION

The government appeals a final order dismissing the indictment in a criminal case. (ROA.88–89.) The district court had jurisdiction under 18 U.S.C. § 3231. The government timely noticed this appeal. (ROA.90.) *See* Fed. R. App. P. 4(b)(1)(B)(i). This Court has jurisdiction under 18 U.S.C. § 3731.

## STATEMENT OF THE ISSUE

Does 18 U.S.C. § 922(n), the federal statute prohibiting receipt of a gun while under felony indictment, facially violate the Second Amendment?

## STATEMENT OF THE CASE

### I.  To promote public safety, § 922(n) bars receiving a gun while under felony indictment.

Section 922(n) states: "It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to … receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

The federal prohibition in § 922(n) has existed in some form since 1938. That year, Congress passed the Federal Firearms Act, limiting gun access by people under indictment as well as convicted felons. *United States v. Laurent*, 861 F. Supp. 2d 71, 82 (E.D.N.Y. 2011); *see United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (noting that the "first federal statute disqualifying felons from possessing firearms was not enacted until

1938" (citing Federal Firearms Act of 1938, ch. 850, § 2(f), 52 Stat. 1250, 1251)). The Federal Firearms Act restricted those under indictment for or convicted of crimes of violence. *Laurent*, 861 F. Supp. 2d at 82. It sought to protect the public by "eliminat[ing] the guns from the crooks' hands, while interfering as little as possible with the law-abiding citizen." S. Rep. No. 82, 75th Cong., 1st Sess. 2 (1937). Congress believed that the restricted classes of people had, "by their past conduct, … demonstrated their unfitness to be entrusted with such dangerous instrumentalities" as guns. *Cases v. United States*, 131 F.2d 916, 921 (1st Cir. 1942).

In 1961, Congress expanded the prohibitions to include all crimes. *Id.* at 83. And in 1968, Congress passed the Gun Control Act, which updated the restrictions on gun access by people under indictment and by convicted felons. *Id.* Among other things, the Gun Control Act "clarified the definition of 'indictment' to include an information or indictment in *any court*— state or federal—if the court had power to prosecute any crime punishable by more than one year in prison." *Id.* (emphasis original). Like the Federal Firearms Act, the Gun Control Act "reflects a concern with keeping firearms out of the hands of categories of potentially irresponsible persons." *Id.* (cleaned up) (quoting *Barrett v. United States*, 423 U.S. 212, 220 (1976)). "In 1986, Congress again revised the statute to combine the provisions of § 922(g)(1) and (h)(1) that dealt with indictees into a single section, § 922(n)." *Id.* at 84. The statutory text has not substantively changed since then.

## II. Sanchez obtained a pistol while under felony indictment for aggravated robbery.

In March 2022, Sanchez was indicted in Texas state court for aggravated robbery, a first-degree felony. (ROA.9.) *See* Tex. Penal Code § 29.03(a), (b).

In July 2022, two people were shot at a home in Midland, Texas, one of whom died. (ROA.8.) Police learned that about 30 shots were fired by four shooters. (ROA.8.) Witnesses identified Sanchez as one of the shooters. (ROA.8.)

About a week later, police arrested Sanchez at the restaurant where he worked. (ROA.8.) He had a loaded 9-milimeter pistol in his waistband. (ROA.8.) He told police that he obtained the pistol the day after the shooting because he was worried people would retaliate against him. (ROA.9.) He admitted that he knew he was under indictment for aggravated robbery. (ROA.9.)

## III. Sanchez pled guilty to receiving a gun while under felony indictment.

Sanchez was charged with receiving a firearm while under felony indictment. (ROA.24.) *See* 18 U.S.C. § 922(n). In September 2022, he pled guilty. (ROA.4, 36, 63–64.)

## IV. The Supreme Court clarified the standard for Second Amendment claims in *Bruen*.

Meanwhile, in July 2022, the Supreme Court decided *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The Court

struck down New York's "may-issue" licensing law, which allowed the executive to issue a license for public carry only on a showing of "proper cause." *Id.* at 2123. The Court clarified that means-end scrutiny is inconsistent with its Second Amendment precedents. *Id.* at 2127–29. It said: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30.

## V. Relying on *Bruen*, the district court dismissed the § 922(n) charge in *United States v. Quiroz*.

In another case before the same district judge as presided over this case, the defendant moved to dismiss his indictment, claiming that § 922(n) violates the Second Amendment under *Bruen*'s framework. *See United States v. Quiroz*, --- F. Supp. 3d ----, 2022 WL 4352482, at *1 (W.D. Tex. 2022). The district court granted the motion, ruling that § 922(n) facially violates the Second Amendment. *Id.* at *13 & n.119. First, the court held that the Second Amendment's plain text covered the defendant. According to the court, the "conduct" burdened by § 922(n) is not "buying a gun *while under felony indictment*" but rather "'receipt' of a firearm—nothing more." *Id.* at *3–4 (quotation marks omitted). Whether the government can restrict receipt "for a specific group of people," the court said,

"would fall under *Bruen*'s second step: the historical justification for that regulation." *Id.* at *3.

Second, the court concluded that § 922(n) is inconsistent with historical tradition. To start, the court dismissed an analogy to restrictions on convicted felons as insufficiently rooted in history. *Id.* at *5. Although the Supreme Court had endorsed felon-in-possession laws in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that endorsement "was in dicta." *Id.* The court then summarized historical gun laws dating to the colonial period and concluded that it was "unclear" and "unproven" whether there exists "a historical justification for disarming those indicted, but not yet convicted, of any crime." *Id.* at *6–7. The court also rejected the government's analogy to historical "surety statutes" as regulating guns "through materially different means." *Id.* at *7–8.

Last, the court expressed "other reasons" it thought "§ 922(n) evokes constitutional scrutiny." *Id.* at *10. First, the court opined that "the nature of grand jury proceedings … casts a shadow of constitutional doubt on § 922(n)." *Id.* It observed that grand-jury proceedings are not adversarial and that defendants sometimes lack the right to a grand jury in state court. *Id.* at *10–11. Second, the court compared § 922(n) to historical laws used as pretexts to "disarm disfavored groups." *Id.* at *11–12. Third, the court observed that some pre-*Heller* precedents upholding § 922(n) rested on the view that the Second Amendment establishes a "collective" rather than individual right. *Id.* at *12; *see Heller*, 554 U.S. 570 (rejecting the collective-

right view and holding that the Second Amendment protects an individual right to bear arms).

The court declared that because it was holding § 922(n) facially unconstitutional, it "need[ed] not answer whether § 922(n) is unconstitutional as applied to" the defendant. *Quiroz*, 2022 WL 4352482, at *13 n.119.

## VI. Adopting its *Quiroz* order, the district court dismissed the charge against Sanchez.

On September 20, 2022—the day after the district court entered its dismissal order in *Quiroz*—Sanchez moved to dismiss his indictment. (ROA.43–60.) He observed that *Bruen* displaced this Court's two-step test for assessing Second Amendment claims. (ROA.46.) And he challenged § 922(n) under *Bruen*'s framework, both facially and as applied to him. (ROA.46.) He argued that his conduct was covered at *Bruen*'s first, textual step because his "status as an individual under indictment is not relevant to whether the Second Amendment protects the conduct." (ROA.48.) And he argued, at *Bruen*'s second step, that § 922(n) is inconsistent with the nation's historical tradition of gun regulation. (ROA.50–54.)

The government opposed dismissal. (ROA.66–86.) First, the government argued that the Second Amendment's plain text does not cover receiving a gun while under felony indictment. (ROA.72–75.) Second, the government argued that § 922(n) squares with the nation's historical tradition of gun regulation, pointing to historical laws disarming potentially

dangerous or "unvirtuous" citizens. (ROA.76–82.) The government also pointed to historical restrictions on the liberties of those accused (but not convicted) of wrongdoing, including pretrial detention and release conditions (ROA.82), as well as surety laws requiring those accused of posing a threat to post a bond before carrying a gun (ROA.83–85). The government acknowledged, however, that the court had rejected these same arguments in *Quiroz*. (ROA.85–86.)

The district court entered a one-page order granting Sanchez's motion to dismiss. (ROA.88.) The court explained that it "ha[d] already conducted an in-depth analysis of § 922(n) and held it unconstitutional in *United States v. Quiroz*." (ROA.88.) Its "reasoning ha[d] not changed." (ROA.88.)

## SUMMARY OF THE ARGUMENT

For decades, no court questioned whether the Second Amendment might cast constitutional doubt on § 922(n)'s narrow prohibition of receiving guns while under felony indictment. A grand jury charged Sanchez with violating that prohibition. *Bruen* does defeat his prosecution. Rather, *Bruen* addressed a sweeping public-carry ban, subject only to case-by-case executive discretion. Although the Supreme Court clarified the analytical framework for Second Amendment claims, it did not upset the applecart of federal gun regulation that has persisted for decades. Nor did the Court retract its past assurances that the Constitution permits a range of narrow,

status-based gun restrictions. Indeed, the Court insisted that its holding did not put legislatures in a "regulatory straightjacket."

A chorus of district courts has thus rejected *Bruen* challenges to § 922(n). *See United States v. Posada*, No. EP-22-CR-1944(1)-KC, 2023 WL 3027877, at *3–6 (W.D. Tex. Apr. 20, 2023); *United States v. Smith*, No. CR 122-081, 2023 WL 3012007, at *3–4 (S.D. Ga. Mar. 29, 2023), *report and recommendation adopted*, No. CR 122-081, 2023 WL 3010178 (S.D. Ga. Apr. 19, 2023); *United States v. Now*, No. 22-CR-150, 2023 WL 2717517, at *9 (E.D. Wis. Mar. 15, 2023), *report and recommendation adopted*, No. 22-CR-150, 2023 WL 2710340 (E.D. Wis. Mar. 30, 2023); *United States v. Jackson*, No. CR ELH-22-141, 2023 WL 2242873, at *16–17 (D. Md. Feb. 27, 2023); *United States v. Stennerson*, No. CR 22-139-BLG-SPW, 2023 WL 2214351, at *2 (D. Mont. Feb. 24, 2023); *United States v. Bartucci*, No. 119CR00244ADABAM, 2023 WL 2189530, at *10 (E.D. Cal. Feb. 23, 2023); *United States v. Simien*, No. SA-22-CR-00379-JKP, 2023 WL 1980487, at *7 (W.D. Tex. Feb. 10, 2023); *United States v. Gore*, No. 2:23-CR-04, 2023 WL 2141032, at *4 (S.D. Ohio Feb. 21, 2023); *United States v. Rowson*, No. 22 Cr. 310 (PAE), 2023 WL 431037, at *25 (S.D.N.Y. Jan. 26, 2023); *United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578, at *5 (M.D. Tenn. Nov. 16, 2022); *United States v. Kays*, No. CR-22-40-D, 2022 WL 3718519, at *5 (W.D. Okla. Aug. 29, 2022). This Court has thrice held that § 922(n) does not plainly violate the Second Amendment under *Bruen*. *See United States v. Morrison*, No. 22-10570, 2023 WL

8

2366984, at *1 (5th Cir. Mar. 6, 2023); *United States v. Williams*, No. 22-10129, 2023 WL 2342341, at *1 (5th Cir. Mar. 3, 2023); *United States v. Avila*, No. 22-50088, 2022 WL 17832287, at *2 (5th Cir. Dec. 21, 2022). The decision below is one of a few stark outliers and should be corrected.

**I.** Section 922(n) is constitutional under a long line of Supreme Court precedent upholding substantial liberty restrictions on defendants awaiting trial. An indictment reflects a grand jury's probable-cause finding that the defendant committed a serious crime. That finding is enough to temporarily allow substantial restrictions on many constitutional rights to promote the administration of justice—the government can seize an indicted defendant's assets or even detain him pending trial. The "presumption of innocence" does not preserve freedom before trial but merely allocates the burden of proof *at trial*, prohibiting criminal punishment before the government proves the defendant's guilt beyond a reasonable doubt.

**II.** Sanchez cannot show that the Second Amendment's plain text covered him. The Second Amendment's text codified a preexisting right that belongs only to law-abiding, responsible citizens. A person's status as non-law-abiding, therefore, counts at *Bruen*'s first, textual step. Many courts—both before and after *Bruen*—have recognized that the Second Amendment does not prohibit legislatures from restricting the gun rights of people whose status or actions show that they will unlikely obey the law. A person's status as an indicted felony defendant puts him outside the

political community of law-abiding citizens whom the Second Amendment covers.

**III.** Even if the Second Amendment's text does not exclude indicted defendants, the nation's historical tradition supports restricting their gun rights. *Bruen*'s historical inquiry requires only a relevantly similar historical analogue, not a historical twin.

Two broad categories of historical laws each establish a historical tradition supporting § 922(n). First, American jurisdictions have always imposed substantial liberty restriction on those accused of committing a crime or posing a threat. These restrictions included pretrial detention without bail—a far heavier burden on the defendant's gun rights than § 922(n)'s narrow prohibition of receipt. And even if not detained pending trial, the accused were commonly stripped of their arms upon arrest and subjected to burdensome pretrial supervision by sureties of the peace. Second, § 922(n) squares with the tradition of categorically disarming specific groups deemed dangerous or untrustworthy.

**IV.** At a minimum, the district court erred in holding § 922(n) facially unconstitutional without determining whether it could constitutionally be applied to Sanchez. It could.

Facial challenges are disfavored and should be granted only as a last resort. When a party challenges a law both facially and as applied, a court should first consider the narrower as-applied challenge. The district court defied these principles. It skipped Sanchez's as-applied challenge and

10

considered only his broader facial challenge. It then held § 922(n) facially unconstitutional without determining that it lacks any constitutional application. That is wrong: no reading of the Second Amendment would cover every circumstance under which an indicted defendant might obtain a gun. Section 922(n) is constitutional as applied to Sanchez, whose indictment for violent aggravated robbery would historically have supplied ample ground for disarmament.

## STANDARD OF REVIEW

This Court "review[s] preserved challenges to the constitutionality of a criminal statute *de novo*." *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014).

## ARGUMENT

### I.   Section 922(n) is constitutional under longstanding Supreme Court precedent letting the government restrict indicted defendants' rights.

This Court need not apply *Bruen*'s framework to § 922(n) because *Bruen* did not silently displace the Supreme Court's framework for assessing pretrial liberty restrictions on indicted defendants. Section 922(n)'s narrow restriction passes constitutional muster under that framework.

The Supreme Court has recognized that an indictment "eliminates" some constitutional liberties. *Kaley v. United States*, 571 U.S. 320, 329 (2014). The "inviolable grand jury finding … may do more than commence a criminal proceeding (with all the economic, reputational, and

personal harms that entails); the determination may also serve the purpose of immediately depriving the accused of her freedom." *Id.* An indictment triggers an arrest warrant without further inquiry into the case's strength or, if the person is already arrested, "eliminates her Fourth Amendment right to a prompt judicial assessment of probable cause to support any detention." *Id.* (citing *Gerstein v. Pugh*, 420 U.S. 103, 114, 117 n.19 (1975)). For federal crimes, the indictment "may play a significant role in" the detention decision itself since the Bail Reform Act creates a presumption of detention "if 'there is probable cause to believe' [the defendant] committed certain serious crimes." *Id.* at 329 n.6 (citing 18 U.S.C. § 3142(e)(2)–(3), (f)). *Kaley* held that the government can also freeze an indicted defendant's forfeitable assets—even if the defendant needs them to pay a lawyer—without violating the Fifth Amendment due-process right or Sixth Amendment right to counsel. *Id.* at 327–28. If the grand jury's probable-cause finding is "reliable enough, protective enough" to "restrain *persons*," then it must be sufficient to restrain property. *Id.*

Similarly, the Supreme Court has held that pretrial detention based on future dangerousness under the Bail Reform Act violates neither the Fifth Amendment due-process right nor the Eighth Amendment prohibition of excessive bail. *United States v. Salerno*, 481 U.S. 739, 754–55 (1987). The Court collected circumstances under which an individual's Fifth Amendment liberties yield to "the government's regulatory interest in community safety," explaining that "competent adults may face

12

substantial liberty restrictions as a result of the operation of our criminal justice system." *Id.* at 748–49 (citing *Gerstein*, 420 U.S. 103). The Court concluded that detaining defendants based on dangerousness was a valid exercise of "the well-established authority of the government, in special circumstances, to restrain individuals' liberty prior to or even without a criminal trial and conviction." *Id.* at 749. While the Court noted that the Bail Reform Act authorizes detention only after an adversarial proceeding at which the government must show that the defendant poses a threat, *see id.* at 750–51, it did not suggest that the Constitution bars Congress from categorically restricting defendants' liberties. Indeed, as set forth in more detail below, nothing in the Constitution bars Congress from mandating detention "in entire classes of cases." *See United States v. Stephens*, 594 F.3d 1033, 1039 (8th Cir. 2010) (relying on that principle to uphold the Adam Walsh Act's mandatory pretrial release conditions categorically restricting some defendants' liberties).

The Court has also upheld restraints on pretrial detainees' First Amendment liberties. *See Bell v. Wolfish*, 441 U.S. 520, 550 (1979). After rejecting Fourth and Fifth Amendment challenges by pretrial detainees to their conditions of confinement, *see id.* at 541, 544, the Court considered whether the First Amendment allowed prison officials to prohibit them from receiving books and magazines other than from the publisher or a book club, *see id.* at 549–51. The Court held that the prohibition did not violate the First Amendment but was a rational response to security

concerns. *Id.* at 550. The Court cited, among other factors supporting its holding, the prohibition's temporary impact on detainees. *Id.* at 552.

These principles control here. "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of over-ruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). The Court's cases governing pretrial liberty restrictions directly control here because § 922(n) applies only to indicted defendants. *Bruen* itself confirmed that its "Second Amendment standard accords with how [the Court] protect[s] other constitutional rights," 142 S. Ct. at 2130, and that the right to bear arms is subject to the same "body of rules [as] the other Bill of Rights guarantees," *id.* at 2156 *see also Heller*, 554 U.S. at 579, 582, 592, 595, 606, 618, 634–635 (comparing the Second Amendment to the First and Fourth Amendments). Thus, § 922(n) is constitutional because the government's regulatory interest in preventing criminal defendants from seeking out guns while facing felony charges and possible imprisonment outweighs the defendants' liberty interest in accessing guns. *Cf. United States v. Wendt*, No. 422CR00199SHLHCA1, 2023 WL 166461, at *5 (S.D. Iowa Jan. 11, 2023) (rejecting a facial Second Amendment challenge to the pretrial gun restriction in § 3142(c)(1)(B)(viii) because the court was "unwilling, without much clearer guidance from

higher courts, to conclude that the Supreme Court *sub silentio* overruled *Salerno* … when it decided *Bruen*").

Given the indictment's historical role, moreover, the "presumption of innocence" is no impediment to restricting indicted defendants' gun rights. Rather, that "presumption" is a *trial* right—"an inaccurate, short-hand description" of the government's burden to prove guilt beyond a reasonable doubt. *Bell*, 441 U.S. at 533 (quoting *Taylor v. Kentucky*, 436 U.S. 478, 484 n.12 (1978)); *see also Estelle v. Williams*, 425 U.S. 501, 503 (1976) (explaining that the presumption protects "the fairness of the fact-finding process" and "guard[s] against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt"). The presumption "has no application" to determining an indicted defendant's liberties "before his trial has even begun." *Bell*, 441 U.S. at 533; *see also Now*, 2023 WL 2717517, at *5 ("The presumption of innocence does not necessarily bring [a person under felony indictment] within the scope of an 'ordinary law-abiding' citizen."); *Smith*, 2023 WL 3012007, at *5 (rejecting the defendant's argument that the presumption of innocence supported his Second Amendment challenge to § 922(n)); *Jackson*, 2023 WL 2242873, at *8 (same).

## II. The Second Amendment's plain text does not cover receiving guns while under felony indictment.

The Second Amendment codified a preexisting understanding of the right to bear arms as covering only law-abiding, responsible citizens. A

felony indictment rests on probable cause that the defendant committed a serious crime and excludes the indicted defendant from the law-abiding citizens entitled to bear arms. Thus, § 922(n) burdens no conduct covered by the Second Amendment's plain text.

## A. The Second Amendment's text codified a preexisting right that covered only law-abiding citizens.

The Second Amendment does not cover all citizens. "[T]he Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right," neither "granted by the Constitution" nor "dependent upon that instrument for its existence." *Heller*, 554 U.S. at 592; *see also id.* at 599 (explaining that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). So the right to bear arms is "enshrined with the scope [it was] understood to have when the people adopted [it]." *Id.* at 634–35.

"The founders understood that not everyone possessed Second Amendment rights." *Range v. Att'y Gen.*, 53 F.4th 262, 271 (3d Cir. 2022) (brackets omitted), *reh'g en banc granted, opinion vacated sub nom.*, 56 F.4th 992 (3d Cir. 2023).[1] To the contrary, "the history of the 'pre-existing right' of 'the people' to 'keep and bear arms,' codified in the Second

---

[1] Although the Third Circuit has granted rehearing en banc and vacated the panel opinion in *Range*, the government cites it for its persuasive value and historical analysis, as many courts have done since it was vacated. *See, e.g.*, *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir. 2023).

Amendment, demonstrates that the Second Amendment right extended, and continues to extend, 'to some categories of individuals, but not others.'" *United States v. DaSilva*, No. 3:21-CR-267, 2022 WL 17242870, at *7 (M.D. Penn. Nov. 23, 2022) (quoting *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044 (11th Cir. 2022)). So "even individuals who are indisputably part of 'the people' … might not partake of that pre-existing right and, therefore, may be prohibited from possessing firearms without offending the Second Amendment." *Id.* (quoting *Jimenez-Shilon*, 34 F.4th at 1045–46).

*Heller* explained that the preexisting right to bear arms was "not unlimited," *see* 554 U.S. at 626, but that the Second Amendment codified a "right of law-abiding, responsible citizens," *see id.* at 635. The Court identified a non-exhaustive list of "presumptively lawful regulatory measures," including the "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626–27 & n.26; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (repeating *Heller*'s "assurances" about restrictions on felons and the mentally ill). Gun restrictions on felons and the mentally ill are presumptively lawful because those groups of people have demonstrated that they are not law-abiding, responsible citizens and are therefore not protected by the Second Amendment's plain text.

*Bruen* confirmed this reading of *Heller*. Echoing *Heller*, the Court explicitly, repeatedly described the Second Amendment right as belonging only to law-abiding citizens. *See, e.g.*, *Bruen*, 142 S. Ct. at 2122 (stating that

17

*Heller* "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense"); *id.* at 2131 (quoting *Heller*'s statement that the Second Amendment protects "'the right of law-abiding, responsible citizens to use arms' for self-defense"); *id.* at 2133 (stating that the historical inquiry should consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *id.* at 2156 (holding that New York's licensing law violates the Second Amendment because "it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms"); *see also Range*, 53 F.4th at 271 (noting that "the [*Bruen*] majority characterized the holders of Second Amendment rights as 'law-abiding' citizens no fewer than fourteen times"). None of those references suggest that the Second Amendment curbs laws restricting the gun rights of non-law-abiding citizens.

Three more aspects of the *Bruen* opinion further confirm that a person's status as non-law-abiding counts at its first, textual step:

First, the *Bruen* opinion itself addressed whether the petitioners were law-abiding citizens in the section (III.A) addressing the Second Amendment's textual scope, not the section (III.B) addressing historical tradition. *See* 142 S. Ct. at 2134. The Court observed that the parties did not dispute "that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." *Id*. (citing *Heller*, 554 U.S. at 580). The Court thus implied that the Second

Amendment covered them *because* they were undisputedly law-abiding, responsible citizens.

Second, *Bruen* (along with *Heller*) set contrary presumptions depending on whether a law keeps law-abiding citizens from bearing arms. As noted, *Heller* established that laws disarming "felons and the mentally ill"—and some other gun regulations—are "presumptively lawful." 554 U.S. at 626 & n.26. In contrast, *Bruen* held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," so that laws prohibiting the conduct are presumptively *unlawful*. 142 S. Ct. at 2126. *Bruen*'s presumptive protection could be "[i]n keeping with" *Heller*'s presumptive lawfulness, *see id.*, only if *Heller*'s "presumptively lawful" regulations burden no conduct covered by the amendment's text. In other words, at least some status-based restrictions of people considered non-law-abiding or irresponsible—"felons and the mentally ill"—are "presumptively lawful" *because* the Second Amendment's text excludes those people.

Third, *Bruen* explained that its opinion should not "be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes," which "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right." 142 S. Ct. at 2138 n.9 (citing *Heller*, 554 U.S. at 635); *see also id.* at 2161 (Kavanaugh, J. concurring) ("[T]he 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so.").

Those regimes require background checks and set "narrow, objective, and definite standards" meant to ensure "that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* at 2138 n.9 (quotation marks omitted). And many states' standards disqualify indicted defendants or anyone prohibited by federal law from having a gun.[2] By indicating that states generally can restrict the gun rights of those considered non-law-abiding under the states' objective criteria, the Court implied that the Second Amendment's text excludes those people. Otherwise, the 43 states' many objective criteria disqualifying applicants for licenses—and thus preventing them from bearing arms—could survive only through case-by-case, historical inquiries. The Court suggested no such thing.[3]

---

[2] *See, e.g.*, Ariz. Rev. Stat. § 13-3112(E)(3) (requiring that the applicant "[i]s not under indictment for and has not been convicted in any jurisdiction of a felony … and [that] the applicant is currently not a prohibited possessor under state or federal law"); Ky. Rev. Stat. § 237.110(4)(a) (requiring that the applicant "[i]s not prohibited from the purchase, receipt, or possession of firearms, ammunition, or both pursuant to 18 U.S.C. 922(g), 18 U.S.C. 922(n), or applicable federal or state law"); La. Stat. § 40:1379.3(C)(10) (requiring that the applicant "not be charged under indictment or a bill of information for any crime of violence or any crime punishable by imprisonment for a term of one year or greater"); Tenn. Code § 39-17-1351(c)(7) (requiring that "the applicant is not currently under indictment or information for any criminal offense that is designated as a felony, or that is [a] disqualifying misdemeanor[]").

[3] The breadth and variability of objective criteria applied by the 43 shall-issue states was not lost on the Court, which collected citations to all the licensing regimes and described how some work. *See Bruen*, 142 S. Ct. at 2123 n.1.

In *Bruen*'s wake, "[t]he majority of courts have concluded that the [Second Amendment] right extends only to law-abiding citizens." *United States v. Black*, No. CR 22-133-01, 2023 WL 122920, at *3 (W.D. La. Jan. 6, 2023) (collecting cases). In rejecting a challenge to § 922(g)(1)'s prohibition of gun possession by convicted felons, for instance, the Third Circuit panel opinion in *Range* (now vacated pending en banc review) explained that "[t]hose whose criminal records evince disrespect for the law are outside the community of law-abiding citizens entitled to keep and bear arms." *Range*, 53 F.4th at 273. The court "[i]nterpret[ed] the text of the Second Amendment in light of the right's 'historical background,'" *id.* at 282 (quoting *Bruen*, 142 S. Ct. at 2127), surveying historical status-based gun laws from 1600s England through the amendment's ratification, *see id.* at 274–81. It held that the Second Amendment's scope "properly excludes those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses, whether or not those crimes are violent." *Id.* at 266; cf. *United States v. Sitladeen*, 64 F.4th 978, 987 (8th Cir. 2023) ("[T]he law of our circuit is that unlawful aliens are not part of 'the people' to whom the protections of the Second Amendment extend.").[4]

---

[4] Many district courts have likewise rejected post-*Bruen* challenges to status-based gun laws on the ground that the restricted people are not law-abiding, responsible citizens whom the Second Amendment covers. *See, e.g.*, *Battles v. United States*, No. 4:23-CV-00063-HEA, 2023 WL 346002, at *1 (E.D. Mo. Jan. 20, 2023) ("*Bruen* confines its holding to the context of regulations that 'burden a *law-abiding citizen's* right to armed self

Some courts held the same before *Bruen* in textual analyses that *Bruen* deemed "broadly consistent" with Supreme Court precedent. *See* 142 S. Ct. 2127. Like *Range*, *Medina v. Whitaker* rejected a challenge to § 922(g)(1) as applied to a nonviolent felon. 913 F.3d 152, 157–58 (D.C. Cir. 2019). To determine "the public understanding of the right" when the Second Amendment was ratified, the Court considered the severe punishments felons then faced, as well as evidence that the founders understood the

---

defense."); *United States v. Medrano*, No. 3:21-CR-39, 2023 WL 122650, at *1–2 (N.D.W. Va. Jan. 6, 2023) (noting that *Bruen*'s "rationale is firmly built upon its chosen 'law-abiding' language, which appears throughout," and holding that "the reach of *Bruen* ends at the feet of those individuals who are not law-abiding citizens"); *United States v. Sanchez*, No. W-21-CR-00213-ADA, 2022 WL 17815116, at *1 (W.D. Tex. Dec. 19, 2022) ("The Supreme Court has held that the right to bear arms is limited to 'law-abiding, responsible citizens.'"); *United States v. Hunter*, No. 1:22-CR-84-RDP-NAD-1, 2022 WL 17640254, at *6 (N.D. Ala. Dec. 13, 2022) (noting the language in *Bruen* "limiting the scope of the Second Amendment right to 'law abiding' citizens"); *United States v. Fencl*, No. 21-CR-3101 JLS, 2022 WL 17486363, at *2 (S.D. Cal. Dec. 7, 2022) (holding that an indicted defendant on pretrial release fell "outside the scope of [the Second Amendment's] protections as he has been charged with unlawful possession of firearms based on a finding of probable cause"); *United States v. Grinage*, No. SA-21-CR-00399-JKP, 2022 WL 17420390, at *5 (W.D. Tex. Dec. 5, 2022) (explaining that *Heller* and *Bruen* "lead[] the Court to conclude convicted felons like Grinage are not included in 'the people' protected by the Second Amendment"); *United States v. Young*, No. CR 22-054, 2022 WL 16829260, at *7 (W.D. Pa. Nov. 7, 2022) ("*Bruen*, *Heller* and *McDonald* dictate that Defendant's alleged conduct does not fall within the scope of the Second Amendment's protections due to his felony drug convictions."); *United States v. Grant*, No. CR 3:22-161-MGL-1, 2022 WL 16541138, at *3 (D.S.C. Oct. 28, 2022) ("By distinguishing non-law-abiding citizens from law-abiding ones, the dicta in *Heller* and *McDonald* clarifies the bounds of the plain text of the Second Amendment.").

right to exclude "those who were not (or could not be) virtuous members of the community." *Id.* at 158–59. The court held that felons—violent or not—"are not among the law-abiding, responsible citizens entitled to the protections of the Second Amendment." *Id.* at 154; *accord United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (holding that "felons are categorically different from the individuals who have a fundamental right to bear arms").

The panel decision in *United States v. Rahimi* does not compel a contrary conclusion. *See* 61 F.4th 443 (5th Cir. 2023), *pet. for cert. pending*, No. 22-915 (filed Mar. 17, 2023). For one thing, the government maintains that *Rahimi* was wrongly decided, in part because the panel did not adopt the government's argument that persons subject to qualifying domestic-violence restraining orders fall outside the scope of the Second Amendment's plain text. *Id.* at 451–53. As set forth above, *Heller* and *Bruen* recognized a substantive limit on the Second Amendment's scope by repeatedly describing the holders of the right as "law-abiding." The government has petitioned for a writ of certiorari in *Rahimi* "on a highly expedited schedule—a little more than two weeks after the issuance of [this Court's] final amended opinion—in order to allow the [Supreme] Court to consider the petition before it recesses for the summer." Petition for Writ of Certiorari at 15–16, *United States v. Rahimi*, No. 22-915 (filed Mar. 17, 2023).

Regardless, what *Rahimi* held as to persons subject to domestic-violence orders does not apply to those under felony indictment. *Rahimi*

23

reasoned that the Second Amendment covers persons subject to civil orders because they do not constitute a "group[] whose disarmament the Founders 'presumptively' tolerated or would have tolerated." *Id.* at 452 (quoting *Heller*, 554 U.S. at 527 n.26). But the panel recognized that being a convicted felon or member of another group subject to "longstanding prohibition[s] on the possession of firearms" could exclude a person "from the political community within the amendment's scope." *Id.* And the panel explicitly noted that its "discussion [was] not to cast doubt on firearms restrictions that attach during criminal proceedings prior to conviction." *Id.* at 452 n.6 (citing 18 U.S.C. §§ 922(n), 3142(c)(1)(B)(viii)); *see also id.* at 464 (Ho, J., concurring) (recognizing that those who commit or threaten violence can, consistently with the Second Amendment, be detained and disarmed through the criminal-justice system, including before trial). Because a felony indictment excludes people from the political community entitled to bear arms, as set forth below, the Second Amendment's textual scope excludes them.

### B. Indicted felony defendants are not law-abiding citizens covered by the Second Amendment's text.

A felony indictment supplies sufficient evidence that an indicted defendant is non-law-abiding to exclude him from the Second Amendment's scope. The Supreme Court has not precisely defined the community of law-abiding, responsible citizens who enjoy the right to bear arms. It has given no indication, however, that only a felony *conviction* establishes that

a person is non-law-abiding. Instead, the Court repeatedly used "its chosen 'law-abiding' language" in both *Heller* and *Bruen. See Medrano*, 2023 WL 122650, at \*1. *Heller*, moreover, identified "felons and the mentally ill" as merely items on a *non*-exhaustive list of people excluded from the Second Amendment's scope. *See* 554 U.S. at 626–27 & n.26. Had the Court meant to require a criminal conviction to negate a citizen's status as law-abiding, it could have said so.

Thus, applying *Heller* and *Bruen*, courts have defined the excluded people more broadly. For instance, in upholding § 922(g)(1), *Range* explained that the Second Amendment excludes those "whose actions demonstrated a disrespect for the rule of law as embodied in the sovereign's binding norms," leaving legislatures "discretion to determine when individuals' status or conduct evinced such a threat sufficient to warrant disarmament." *Range*, 53 F.4th at 280–81. Courts have reasoned similarly to reject Second Amendment challenges to § 922(g)(3), prohibiting gun possession by "an unlawful user of or addict[] to any controlled substance," even though that statute requires no judicial process at all to trigger its prohibition. *See, e.g.*, *Sanchez*, 2022 WL 17815116, at \*1–3. *Sanchez* recognized that *Heller* held—and *Bruen* "recently confirmed"—that "the right to keep and bear arms belongs only to 'law-abiding citizens.'" *Id.* at \*1. The court upheld § 922(g)(3) at *Bruen*'s first, textual step because it "limits only persons that are not law-abiding from obtaining firearms and thus does not cover conduct protected by the Second Amendment." *Id.* at

*3; *see also United States v. Seiwert*, No. 20 CR 443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022) (agreeing with the government that unlawful drug users or addicts under § 922(g)(3) "are not, by definition, law-abiding citizens" and so "fall outside the Second Amendment's protection"). Because § 922(n) requires an indictment, it requires *more* judicial process to trigger its prohibition than does § 922(g)(3).

Precedents construing other constitutional rights confirm that indicted felony defendants are insufficiently law-abiding to enjoy Second Amendment rights. As set forth above, probable cause that a person committed a crime—and especially indictment by a grand jury for a serious crime—allows many liberty restrictions that would otherwise violate the Constitution. *See supra* Part I. By the same token, a felony indictment sufficiently establishes the indicted defendant's status as non-law-abiding that the Second Amendment does not "presumptively protect[]" his right to bear arms. *See Bruen*, 142 S. Ct. at 2126. The right to bear arms—like the other rights to which the Supreme Court has compared it—yields to the government's regulatory interest in promoting "community safety" and "preventing crime by arrestees." *See Salerno*, 481 U.S. at 748–49.

One court applying *Bruen* to an indicted defendant reached exactly that conclusion. *See United States v. Fencl*, No. 21-CR-3101 JLS, 2022 WL 17486363, at *2 (S.D. Cal. Dec. 7, 2022), *aff'd*, *opinion forthcoming*, *United States v. Garcia*, No. 22-50314, 2023 WL 2596689, at *1 (9th Cir. Jan. 26, 2023). *Fencl* held that a pretrial release condition barring gun possession,

*see* 18 U.S.C. § 3142(c)(1)(B)(viii), does not violate the Second Amendment. *Id.* The court reasoned that the defendant fell outside the amendment's scope because "he has been charged with unlawful possession of firearms based on a finding of probable cause." *Id.* It rejected the defendant's appeal to the presumption of innocence, explaining that it "does not deprive the Government of the ability to place significant, but temporary, restrictions on an accused's constitutional rights in order to further its interest in community safety." *Id.* (citing *Salerno*, 481 U.S. at 748); *see also Now*, 2023 WL 2717517, at *5 (expressing "doubt[] that [a § 922(n) defendant] ha[d] sustained his burden to show that he is an 'ordinary law-abiding' citizen so as to come within 'the people' subject to the protection of the Second Amendment," but assuming that the text covers indicted defendants and resolving the case under *Bruen*'s history inquiry); *Jackson*, 2023 WL 2242873, at *8 (reasoning that "a citizen under indictment is by no means akin to the status of a law-abiding individual, such that the plain text of the Second Amendment applies to an individual under indictment," but assuming that the text covers indicted defendants and resolving the case under *Bruen*'s history inquiry).

## III. Section 922(n) squares with the nation's historical tradition of gun regulation.

Even if the Second Amendment covers indicted defendants, § 922(n) is consistent with the right to bear arms because it squares with historical tradition. When comparing modern and historical gun laws, courts must

often "reason[] by analogy," which "requires a determination of whether the two regulations are relevantly similar." *Bruen*, 142 S. Ct. at 2132 (quotation marks omitted). *Bruen* gave no "exhaustive survey of the features that render regulations relevantly similar" but noted "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. In other words, the central inquiry is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133.

"[A]nalogical reasoning," the Court continued, is not "a regulatory straitjacket." *Id.* at 2133. It "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.*; *see also Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012) ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

*Bruen*'s guidance forecloses simply "comparing the modern law under review with the laws of a couple of centuries ago, like a redline comparison in a word processing application." *Kelly*, 2022 WL 17336578, at *2 (upholding § 922(n)). That is "because a list of the laws that *happened to exist* in the founding era is, as a matter of basic logic, not the same thing

as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." *Id.* A court conducting *Bruen*'s historical inquiry must not only "consider what earlier legislatures did, but imagine what they could have imagined." *Id.*; *see also United States v. Lewis*, No. CR-22-368-F, 2023 WL 187582, at *4 (W.D. Okla. Jan. 13, 2023) (considering how "a colonial legislature would have" assessed "the hazard presented by an armed habitual user of illegal drugs"); *United States v. Nutter*, No. 2:21-CR-00142, 2022 WL 3718518, at *5 (S.D.W. Va. Aug. 29, 2022) (framing the "core question" as "whether the prohibition at issue *would have been viewed* as consistent with the Second Amendment in the founding era" (emphasis added)).

Finally, *Bruen*'s historical inquiry does not split into (1) a "straightforward" approach for laws "address[ing] a general societal problem that has persisted since the 18th century," which requires a "distinctly similar" historical law; and (2) "a more nuanced approach" for laws addressing "unprecedented societal concerns," which calls for analogical reasoning. The court did not discuss those concepts in absolute or mandatory terms. It merely offered guidance on how courts "may" approach cases depending on their context. *See id.* at 2132. It used the phrase "distinctly similar" only once, and even then described "the lack of a distinctly similar historical regulation" only as "relevant evidence"—not as dispositive. *See id.* at 2131. *Bruen* itself considered a law addressing a persistent problem, *id.* at

2131–32, but still scoured centuries of English and American history for relevantly similar analogues, *see id.* at 2135–56. Courts making the historical-tradition inquiry have thus recognized that they can take both "straightforward" and other approaches to the *same case* as needed. *See, e.g.*, *United States v. Charles*, No. MO:22-CR-00154-DC, 2022 WL 4913900, at *4 (W.D. Tex. Oct. 3, 2022) ("With the straightforward historical inquiry unclear, a more nuanced approached is necessary.").

Two broad historical traditions sustain § 922(n)'s restriction on indicted felony defendants: (1) historical liberty restrictions on criminal defendants and suspects; and (2) historical laws restricting the gun rights of groups deemed dangerous or untrustworthy to obey the law. Each of these three has been held sufficient in *Bruen*'s wake to establish a tradition supporting § 922(n). *See Posada*, 2023 WL 3027877, at *3–6; *Smith*, 2023 WL 3012007, at *3–4; *Now*, 2023 WL 2717517, at *9; *Jackson*, 2023 WL 2242873, at *16–17; *Stennerson*, 2023 WL 2214351, at *2; *Bartucci*, 2023 WL 2189530, at *10; *Simien*, 2023 WL 1980487, at *7; *Gore*, 2023 WL 2141032, at *4; *Rowson*, 2023 WL 431037, at *21–24; *Kelly*, 2022 WL 17336578, at *5; *Kays*, 2022 WL 3718519, at *5; *see also Fencl*, 2022 WL 17486363, at *3 (holding that the same historical threats established a tradition supporting the pretrial gun restriction in 18 U.S.C. § 3142(c)(1)(B)(viii)); *United States v. Perez-Garcia*, No. 22-CR-1581-GPC, 2022 WL 17477918, at *4–5 (S.D. Cal. Dec. 6, 2022) (same); *United States*

*v. Slye*, No. 1:22-MJ-144, 2022 WL 9728732, at *2–3 (W.D. Penn. Oct. 6, 2022) (same).

### A.    Section 922(n) is analogous to historical liberty restrictions on the accused.

The Second Amendment has always tolerated some liberty restrictions on the accused. Our society has traditionally recognized that governments are entitled to "secure the due attendance of the party accused" at a criminal trial. *Ex parte Milburn*, 9 Pet. 704, 710 (1835) (Story, J.). It has also traditionally recognized that governments are entitled to preserve "the safety of the people" from offenders who are still awaiting trial. Anthony Highmore, *A Digest of the Doctrine of Bail in Civil and Criminal Cases* vii (1783). To meet these goals, governments have always subjected criminal defendants and suspects to temporary liberty restrictions— some affecting their ability to keep and bear arms.

**1.** At the founding, people indicted for serious crimes were usually detained without bail. And because legislatures could constitutionally deprive indicted defendants of their liberty entirely, they necessarily can impose the lesser restriction of temporarily prohibiting receipt of firearms.

Indicted defendants have always lacked an absolute right to freedom pending trial. "There is no constitutional right to bail." Clara Kalhous, *et al.*, *Bail Pending Trial, Changing Interpretations of the Bail Reform Act & the Importance of Bail from Defense Attorneys' Perspective*, 32 Pace L. Rev. 800, 800 (2012) (citing William Duker, *The Right to Bail: A Historical Inquiry*, 42

Alb. L. Rev. 33, 34 (1977)); *see also United States v. Perry*, 788 F.2d 100, 111 (3d Cir. 1986) (observing that most "federal courts that have addressed the issue have held that there is no absolute right to bail"); *United States v. Edwards*, 430 A.2d 1321, 1327 (D.C. 1981) (observing that "a fundamental right to bail was not universal among the colonies or among the early states" and explaining that historical bail rights were statutory, not constitutional). While the Eight Amendment forbids *excessive* bail, it "fails to say all arrests must be bailable." *Carlson v. Landon*, 342 U.S. 524, 546 (1952). Rather, it "was lifted with slight changes from the English Bill of Rights Act," which was never "thought to accord a right to bail in all cases." *Id.* Legislatures thus retain the power to "defin[e] the classes of cases in which bail shall be allowed." *Id.*; *see also Stephens*, 594 F.3d at 1039 (8th Cir. 2010) (observing that "Congress may ban bail in entire classes of cases").

American legislatures have always provided for pretrial detention of some indicted defendants. "Capital defendants have been excluded from bail"—and thus detained—"since the colonial days, and there is some evidence that this exclusion was a public-safety measure." Sandra G. Mayson, *Dangerous Defendants*, 127 Yale L.J. 490, 502 (2018); *Slye*, 2022 WL 9728732, at *2 ("The precedent for denial of pretrial release to those accused of crimes dates to the early days of the Republic—indeed to English common law."). The Judiciary Act of 1789—passed two years before the Second Amendment's ratification—embraced this principle. It provided that a defendant accused of a federal crime could "be arrested, and

imprisoned or bailed, as the case may be, for trial." Act of Sept. 24, 1789, ch. XX, 1 Stat. 73, § 33 (1789). Bail was allowed "except where the punishment may be death, in which cases it shall not be admitted but by [a court or judge], who shall exercise their discretion therein, regarding the nature and circumstances of the offence, and of the evidence, and the usages of law." *Id.*

At the founding, moreover, courts' power to detain capital defendants swept broadly because "death was 'the standard penalty for all serious crimes.'" *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) (citation omitted); *see Tennessee v. Garner*, 471 U.S. 1, 13 (1985) (explaining that, at common law, "virtually all felonies were punishable by death"). "Capital punishment for felonies was ubiquitous in the late Eighteenth Century." *Medina*, 913 F.3d at 158 (cleaned up). Capital crimes "included nonviolent offenses that we recognize as felonies today, such as counterfeiting currency, embezzlement, and desertion from the army." *Medina*, 913 F.3d at 158; *see also Range*, 53 F.4th at 280 ("Historically, several non-violent felonies were punishable by death and forfeiture of the perpetrator's entire estate."); *Furman v. Georgia*, 408 U.S. 238, 355 (1972) (Marshall, J., concurring) (listing capital crimes in colonial New England, including "idolatry," "blasphemy," "assault in sudden anger," "adultery," "perjury in a capital trial," and "rebellion").

Indictment for a serious (and thus capital) crime virtually ensured pretrial detention. A founding-era capital defendant's entitlement to bail

turned on the strength of the case against him. Thus, while the Judiciary Act made bail discretionary in capital cases, it directed courts to "exercise their discretion" in light of the "evidence" against the defendant. Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 91. Similarly, "every state that entered the Union after 1789, except West Virginia and Hawaii, guaranteed a right to bail in its original state constitution." Donald B. Verrilli, Note, *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328, 351 (1982). But the provision was "with little variation expressed in the following language: 'All prisoners shall be bailable by sufficient sureties, unless for capital offenses, where the proof is evident or presumption great.'" *Id.* at 351.

In determining whether the evidence was sufficiently strong deny bail, courts heavily weighed the grand jury's indictment. Chief Justice Marshall's decisions during Aaron Burr's trial for treason (a capital crime) illustrate that practice. Chief Justice Marshall "admitted [Burr] to bail" "before indictment" but "refused bail" "after indictment." Thomas F. Davidson*, The Power of Courts to Let to Bail*, 24 Am. L. Reg. 1, 3 (1876). At the bail hearing, Chief Justice Marshall "doubted extremely" whether he had the power to grant bail "after an indictment." 1 David Robertson, *Reports of the Trials of Colonel Aaron Burr* 311 (1808). He rejected Burr's invitation to "go into testimony extrinsic to the indictment," stating that he "had never known a case … where such an examination had taken place." *Id.* at 312 (emphasis omitted). Many courts followed Chief Justice

34

Marshall's lead, refusing bail after "the grand jury f[ound] a bill for a capital offence." *The Territory v. McFarlane*, 1 Mart.(o.s.) 216, 217 (Orleans Super. Ct. 1811); *accord State v. Hill*, 1 Tread. 242, 246 (S.C. 1812) (opinion of Smith, J.); *State v. Mills*, 2 Dev. 420, 421–422 (N.C. 1830); *People v. McLeod*, 3 Hill 635, 645 (N.Y. 1842); *People v. Tinder*, 19 Cal. 539, 543, 546 (1862) (Field, C.J.).

The historical tradition of detaining defendants charged with serious crimes supports restricting their right to receive guns while under indictment. "[I]ncarceration naturally entails the loss of a wide range of liberties—including the loss of access to weapons." *Rahimi*, 61 F.4th at 464 (Ho, J., concurring). As much, the power to detain naturally encompasses the power to impose some lesser liberty restrictions. *Cf. Kaley*, 571 U.S. at 330 (reasoning that "it would be odd to conclude" that the government cannot seize forfeitable assets on a grand jury's probable-cause finding when "that showing is often sufficient to restrain *persons*" (cleaned up)); *Stephens*, 594 F.3d at 1039 (reasoning that Congress's power to ban bail in some cases implies the power to impose "the Adam Walsh Act's much less restrictive mandatory release conditions" requiring a curfew and electronic monitoring). Indeed, the founding generation may have foregone gun (and other liberty) restrictions specifically targeting those charged with serious crimes as unnecessary because they were often detained. *See Rowson*, 2023 WL 431037, at *24.

Thus, applying *Bruen*, some district courts have upheld gun restrictions on indicted defendants based on the nation's history of pretrial detention. *See Posada*, 2023 WL 3027877, at *3–6 (upholding § 922(n) on that basis); *Jackson*, 2023 WL 2242873, at *16–17 (same); *Slye*, 2022 WL 9728732, at *2–3 (same for the pretrial gun restriction in § 3142(c)(1)(B)(viii)). In *Jackson*, the court explained that "the historical tradition of sometimes detaining defendants charged with serious crimes supports restricting their Second Amendment rights while under indictment." 2023 WL 2242873, at *17. The court observed that "a felony indictment already allows for a range of liberty restrictions," including detention, "despite constitutional rights," and may also "trigger the seizure of assets." *Id.* (citing *Kaley*, 571 U.S. at 327–28). Similarly, in *Slye*, the court explained that "[i]t would be illogical to conclude" that a court has the authority to detain an indicted defendant, thus denying him many constitutional rights, "but lacks the authority to impose far less severe restrictions, such as ordering his release on bond with a firearms restriction." 2022 WL 9728732, at *2. "Given the long-standing precedent for denial of pretrial release and its attendant right to possess firearms," the court ruled that § 3142(c)(1)(B)(viii) squares with historical tradition. *Id.* at *3; *see also Fencl*, 2022 WL 17486363, at *3 (upholding § 3142(c)(1)(B)(viii) based partly on "this Nation's historical tradition of pretrial detention (and its attendant restrictions on an individual's Second Amendment rights)").

As these courts have recognized, § 922(n) imposes a far lesser burden on an indicted defendant than does detention. *See Posada*, 2023 WL 3027877, at *3–6 (observing that *Bruen* permits "common sense reasoning" that "heavy restrictions are typically more problematic than light ones" (quoting *Kelly*, 2022 WL 17226578, at *6)); *see also Bruen*, 142 S. Ct. at 2133 (explaining that a central consideration in analogical reasoning is whether the historical restriction comparably burdens the right to armed self-defense). Pretrial detention strips a defendant of all Second Amendment rights and severely restricts many other "core constitutional rights," like freedom of speech, freedom of association, and reasonable privacy expectations. *See Slye*, 2022 WL 9728732, at *2 & n.4. In contrast, § 922(n) imposes "a much narrower prohibition on obtaining new weapons during the period of time in which a person is the subject of an active felony prosecution." *Kelly*, 2022 WL 17336578, at *6. That narrow prohibition squares with the historical tradition of severely restricting indicted defendants' liberties. This Court should thus hold that § 922(n) is analogous to historical laws allowing pretrial detention.

**2.** A founding-era defendant who was released on bail was still subject to significant pretrial liberty restrictions. A defendant seeking release on bail had to find "sureties"—that is, friends, neighbors, or other third parties who were willing to guarantee his attendance at trial and his good behavior in the meantime. *See* 3 William Blackstone, *Commentaries on the Laws of England* 290 (1765). Sureties were responsible for "monitoring"

and "keeping track" of the defendant after release. John F. Duffy & Richard M. Hynes, *Asymmetric Subsidies and the Bail Crisis*, 88 U. Chi. L. Rev. 1285, 1313 (2021). Courts "look[ed] to their vigilance to secure the attendance and prevent the absconding of the [defendant]." *United States v. Simmons*, 47 F. 575, 577 (C.C.S.D.N.Y. 1891). Sureties were also often required to ensure that the defendant "ke[pt] the peace" until trial. 4 Blackstone 250. If the sureties failed to fulfil their duties, they would forfeit a sum of money, over and above the sum forfeited by the defendant. *See* 3 *id.* at 280; 4 *id.* at 250.

To enable sureties to fulfill their functions, the common law granted them legal custody of the bailed defendant. Lord Chief Justice Coke explained that the "word Baile" is "derived from the French word Bailer, which signifieth to deliver, because he that is Bailed, is as it were delivered into the hands and custody of those that are his Pledges and Sureties." Edward Coke, *A Little Treatise of Baile and Maineprize* 1 (2d ed. 1637). Lord Chief Justice Hale agreed that "he that is bailed, is in supposition of law still in custody, and the parties that take him to bail are in law his keepers." 2 Matthew Hale, *The History of the Pleas of the Crown* 124 (1736). Blackstone defined bail as "a delivery, or bailment, of a person to his sureties, … he being supposed to continue in their friendly custody, instead of going to gaol." 3 Blackstone 290. And the Supreme Court observed in the 19th century that a bailed defendant "is regarded as delivered to the custody of

his sureties," whose "dominion is a continuance of the original imprisonment." *Taylor v. Taintor*, 83 U.S. 366, 371 (1873).

As the defendant's legal custodians, the sureties enjoyed "unrestricted authority over [his] person." Charles Petersdorff, *A Practical Treatise on the Law of Bail in Civil and Criminal Proceedings* 514 (1824). "Whenever they ch[ose] to do so," they could terminate the defendant's release, "seize him," and "deliver him up" to the court. *Taylor*, 83 U.S. at 371. To that end, they could "pursue him," "break and enter his house," "arrest him," and even "imprison him" until he could be surrendered. *Id.* at 371. They could also restrict his movement, say by forbidding him to "go beyond the limits of the State within which he is to answer." *Id.* at 372. A defendant's sureties were thus "gaolers of his own choosing." 2 William Hawkins, *A Treatise of the Pleas of the Crown* ch. 15, § 84, at 178 (6th ed. 1787). They had the defendant "on a string," and they could "pull the string whenever they please[d]." *Taylor*, 83 U.S. at 372 (citation omitted). Thus—like pretrial detention—the historical conditions of pretrial release for serious crimes imply the power to bar an indicted defendant from obtaining guns while awaiting trial.[5]

_____

[5] Some English and early American laws required a "surety of the peace" based on a mere accusation that a person "*would likely violate the law in the future*," *Young v. Hawaii*, 992 F.3d 765, 791 n.12 (9th Cir. 2021) (en banc) (emphasis added), *vacated*, 142 S. Ct. 2895 (2022), and disarmed the person until he found such a surety, *see Bruen*, 142 S. Ct. at 2148 & n.23. *See also Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017) (explaining that English surety laws required a person "reasonably accused

**3.** Even those merely accused of (but not formally charged with) a crime were historically subject to some forms of disarmament. The common law has long allowed the arresting officer to seize, among other things, a suspect's "weapons," lest the suspect use them to "effect an escape from custody." *Agnello v. United States*, 269 U.S. 20, 30 (1925). That power was "always recognized under English and American law" and was "uniformly maintained in many cases." *Weeks v. United States*, 232 U.S. 383, 392 (1914). In keeping with the common law, the Supreme Court's Fourth Amendment cases establish that, "[w]hen an arrest is made, it is reasonable for the arresting officer to search the person in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape." *Chimel v. California*, 395 U.S. 752, 762–763 (1969).

---

of posing a threat" "to post a bond to be used to cover any damage he might do" by carrying a gun); 4 William Blackstone, *Commentaries on the Laws of England* 252 (1769) (describing this practice in England); William Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829) (describing the adoption of this practice in the American colonies). These "surety statutes" were also relevantly similar to § 922(n) because they imposed a temporary, partial burden on a person's right to bear arms on a showing (similar to a grand jury's probable-cause finding) that the person posed a threat. *See Smith*, 2023 WL 3012007, at *3–4 (holding that surety statutes are analogous to § 922(n)); *Jackson*, 2023 WL 2242873, at *16–17 (same); *Bartucci*, 2023 WL 2189530, at *10 (same); *Simien*, 2023 WL 1980487, at *7 (same); *Gore*, 2023 WL 2141032, at *4 (same); *Rowson*, 2023 WL 431037, at *23–24 (same); *Kays*, 2022 WL 3718519, at *5 (same); *see also Fencl*, 2022 WL 17486363, at *3 (so holding as to the pretrial gun restriction in § 3142(c)(1)(B)(viii)); *Perez-Garcia*, 2022 WL 17477918, at *4–5 (same).

One 19th-century court cited that doctrine to illustrate the point that the right to keep and bear arms is not absolute. *See State v. Buzzard*, 4 Ark. 18, 21 (1842). The court observed that "[p]ersons accused of a crime, upon their arrest, have constantly been divested of their arms, without the legality of the act having ever been questioned." *Id.* But it asked rhetorically, "[i]f the right to keep and bear arms be subject to no legal control or regulation whatever, … [b]y what legal right can a person accused of a crime be disarmed?" *Id.* The power to disarm arrestees supplies yet another historical analogue supporting modern laws that, like § 922(n), restrict people's gun rights incident to the operation of the criminal-justice process.

### B.  Section 922(n) is analogous to historical laws disarming dangerous or untrustworthy people.

Section 922(n) is also analogous to laws disarming dangerous or untrustworthy people. English and American governments have long restricted some people's gun rights to promote public safety. "[B]y the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see id.* at 259–61 (detailing history).

The American colonies inherited that tradition. "The historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations

were on the books." *Nat'l Rifle*, 700 F.3d at 200.[6] The colonies (and later the states) passed laws that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145. Those statutes "all but codified the existing common law in this regard." *Id.* at 2144 n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736)). Before the ratification of the Second Amendment in 1791, at least four colonies or states had codified the common-law prohibition on going armed offensively and authorized the arrest of those who did so. *See* 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52–53 (1869) (1692 statute); Acts and Laws of His Majesty's Province of New Hampshire in New England; with Sundry Acts of Parliament 17 (1771) (1701 statute); 1 Laws of the State of North Carolina, including the Titles of Such Statutes and Parts of Statutes of Great Britain as Are in Force in Said State 131–32 (1821) (1741 statute); Collection of All Such Acts of the General Assembly of Virginia, of a

---

[6] *Bruen* abrogated *National Rifle*'s application of means-end scrutiny to the Second Amendment. *See* 142 S. Ct. at 2127 n.4. But this Court was "inclined to uphold the challenged federal laws at step one of [its pre-*Bruen*] analytical framework," *see Nat'l Rifle*, 700 F.3d at 204, which relied on text and history and was "broadly consistent with *Heller*," *see Bruen*, 142 S. Ct. at 2127. Nothing in *Bruen* abrogates this Court's or other courts' textual or historical analyses at "step one" of their pre-*Bruen* frameworks. *See United States v. Grinage*, No. SA-21-CR-00399-JKP, 2022 WL 17420390, at *2 (W.D. Tex. Dec. 5, 2022) ("[T]o the extent pre-*Bruen* cases relied on textual and historical analysis to find firearms restrictions constitutional, those cases are still good law.").

Public and Permanent Nature, as Are Now in Force 33 (1794) (1786 stat-
ute). Three of those statutes (all but North Carolina) required forfeiture of
the offender's weapons. Other states soon followed. *See, e.g.*, A Compila-
tion of the Statutes of Tennessee of a General and Permanent Nature,
from the Commencement of the Government to the Present Time 99–100
(1836) (1801 statute).

Also "noteworthy" among "revolutionary and founding-era gun reg-
ulations are those that targeted particular groups for public safety rea-
sons." *Nat'l Rifle*, 700 F.3d at 200. "The earliest firearm legislation in co-
lonial America prohibited Native Americans, Black people, and inden-
tured servants from owning firearms." *Range*, 53 F.4th at 276.[7] And, as the
English Parliament had done after the Glorious Revolution, some colonies
passed laws disarming Catholics who refused "to take oaths recognizing
the legal authority of the Crown, rather than the Pope, over matters of
religion." *Id.* at 277. Protestant majorities in those colonies disarmed
Catholics because they "viewed Catholics as defying sovereign authority
and communal values." *Id.*

During the revolutionary war, "several jurisdictions passed laws that
confiscated weapons owned by persons who refused to swear an oath of

---

[7] As *Range* observed, these laws are repugnant and would be unconstitu-
tional today; yet they show that "legislatures had the power and discretion
to use status as a basis for disarmament, and … that status-based bans did
not historically distinguish between violent and non-violent members of
disarmed groups." 53 F.4th at 276 n.18.

allegiance to the state or to the nation." *Nat'l Rifle*, 700 F.3d at 200. In *Range*, the Third Circuit described several such laws, including a 1774 Connecticut law and 1777 laws passed by Pennsylvania and Virginia. 53 F.4th at 278–79; *see also Medina*, 913 F.3d at 159 (explaining that "during the revolution, the states of Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States"); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157–60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506–08 (2004); Joyce Lee Malcolm, To Keep and Bear Arms 140–41 (1994). Like laws disarming Catholics, these oaths laws disarmed not just violent individuals but also those who demonstrated "disrespect for the rule of law and the norms of the civic community." *Range*, 53 F.4th at 279 (citing Churchill, *Gun Regulation*, 25 Law & Hist. Rev. at 158).

Accounts of the ratification debates confirm the founders' belief that "disarming select groups for the sake of public safety was compatible with the right to arms specifically and with the idea of liberty generally." *Nat'l Rifle*, 700 F.3d at 200. "*Heller* identified … as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en

banc) (quoting 554 U.S. at 604); *see also Range*, 53 F.4th at 280. That report recognized that the government could disarm potentially dangerous or untrustworthy people, stating that "citizens have a personal right to bear arms 'unless for *crimes committed, or real danger of public injury*.'" *Id.* (emphasis added) (quoting 2 Bernard Schwarz, The Bill of Rights: A Documentary History 662, 665 (1971)). Similarly, Samuel Adams offered an amendment at the Massachusetts convention to ratify the Constitution recommending "that the said Constitution be never construed to authorize Congress … to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwarz, The Bill of Rights 674–75, 681 (emphasis added). Thomas Cooley's 1868 treatise, which *Heller* described as "massively popular," 554 U.S. at 616, later explained that some groups were "almost universally excluded" from exercising certain civic rights like gun rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 29 (1st ed. 1868).

"[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam) (quoting *Vongxay*, 594 F.3d at 1118 (collecting scholarly sources)); *Carpio-Leon*, 701 F.3d at 979–80 (same). The Second Amendment thus incorporates "a

common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible" and "'does not preclude laws disarming the unvirtuous (i.e. criminals).'" *Bena*, 664 F.3d at 1183–84 (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)); *see also United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as … limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." (quoting Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002))).

The tradition of disarming dangerous or untrustworthy people supports § 922(n)'s restriction on indicted defendants. It gives legislatures "both authority and broad discretion to determine when individuals' status or conduct evince[s] such a threat sufficient to warrant disarmament." *Range*, 53 F.4th at 282. It therefore supports gun restrictions on not just convicted felons or violent people, but also others deemed untrustworthy to obey the law. *See id.* Section 922(n) is "relevantly similar" to these historical precursors under the "two metrics" *Bruen* offered: "how and why the regulations burden" Second Amendment rights. *See* 142 S. Ct. at 2132–33. As to "how" § 922(n) operates, like these precursors, it uses an objective criterion to categorically restrict a specific group's gun rights. As to "why," § 922(n) seeks "to combat violence and promote public safety" by

"keeping firearms out of the hands of categories of potentially irresponsible persons." *Laurent*, 861 F. Supp. 2d at 82 (ellipses omitted). Section 922(n) thus represents a permissible legislative judgment that a person's status as an indicted felony defendant warrants disarmament.

Many district courts deciding *Bruen* challenges to § 922(n) have agreed. *See Posada*, 2023 WL 3027877, at *3–6; *Smith*, 2023 WL 3012007, at *3–4; *Stennerson*, 2023 WL 2214351, at *2; *Bartucci*, 2023 WL 2189530, at *10; *Rowson*, 2023 WL 431037, at *21–22; *Kelly*, 2022 WL 17336578, at *5. "Viewing these laws in combination, the above historical laws bespeak a public understanding of the Second Amendment right in the period leading up to 1791 as permitting the denial of access to firearms to categories of persons based on their perceived dangerousness." *Rowson*, 2023 WL 431037, at *22. Section 922(n) is consistent with that tradition because it "imposes a partial limit on the firearms rights of a group of persons defined by an objective characteristic that is a fair proxy for dangerousness: an indictment for a felony punishable by a year or more in prison," and because its burden "is limited in scope (barring the indictee from shipping, transporting, or receiving firearms, but not from possessing them) and time (expiring upon the disposition of the indictment)." *Id.*; *see also Kelly*, 2022 WL 17336578, at *5 & n. & (concluding that "[b]ecause 18 U.S.C. § 922(n) is of a piece with the type of laws that were treated as consistent with the historical right to bear arms," it does not violate the

Second Amendment even though it "diverges from those laws in some specifics").

*Rahimi* does not defeat the analogy between § 922(n) and historical "dangerousness" laws. The panel there concluded that § 922(g)(8) is not relevantly similar to such laws "because out of the gate, *why* they disarmed people was different." *Rahimi*, 61 F.4th at 457. According to the panel, their purpose was to preserve "political and social order," not to protect "an identified person from the specific threat posed by another." *Id.* Although the government believes those distinctions should not have mattered in *Rahimi*, § 922(n) is more like historical "dangerousness" laws in this respect: it restricts the whole class of people subject to a felony indictment of any kind, and its restriction is meant to protect the public, not an identified victim.

## IV.  At minimum, § 922(n) is constitutional as applied to Sanchez, a question the district court did not reach.

While Parts I though III, *supra*, establish that § 922(n) is constitutional in all its applications, at minimum, the district court erred in holding § 922(n) facially unconstitutional without determining whether it could constitutionally be applied to Sanchez. It could.

Facial challenges "should be granted sparingly and only as a last resort." *United States v. McGinnis*, 956 F.3d 747, 752–53 (5th Cir. 2020). A party bringing a facial challenge can succeed only "by 'establishing that no set of circumstances exists under which the Act would be valid,' *i.e.*,

that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *Salerno*, 481 U.S. at 745) (brackets omitted). "When a litigant brings both as-applied and facial challenges, [the Court] generally decide[s] the as-applied challenge first because it is the narrower consideration." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019).

The district court defied these principles. The court's order considered *no* case-specific facts concerning § 922(n)'s application to Sanchez but summarily adopted the court's facial constitutional ruling *from another case*. (ROA.88.) That ruling, in turn, purported to hold that § 922(n) is facially unconstitutional without determining "that no set of circumstances exists under which [it] would be valid." *Washington State Grange*, 552 U.S. at 449 (quoting *Salerno*, 481 U.S. at 745); *see Quiroz*, 2022 WL 4352482, at *13 & n.119. The court neither recited nor applied *Salerno*'s standard. Instead of asking whether § 922(n) has *any* valid application, the court offered hypothetical scenarios that, in its view, might raise constitutional concerns. The court attacked § 922(n) because it might restrict the gun rights of someone indicted based on grand jury testimony that violated the Fourth of Fifth Amendments, or in state-court proceedings that afforded no grand-jury right. *Quiroz*, 2022 WL 4352482, at *10–11. The court also implied that the government might use § 922(n) "to pretextually and unlawfully disarm disfavored groups." *Id.* at *11. But the record contains no whiff of these things. The court thus inverted the proper inquiry, ruling based in part on

49

"speculat[ion] about hypothetical or imaginary cases." *See Washington State Grange*, 552 U.S. at 450 (quotation marks omitted).

No proper application of *Salerno*'s standard could sustain the district court's ruling that § 922(n) is facially unconstitutional. At least some applications of § 922(n) surely violate no Second Amendment rights. *Cf. Wendt*, 2023 WL 166461, at *5 (holding that § 3142(c)(1)(B)(viii)'s pretrial gun restriction is not invalid in all its applications because "the Court lawfully could impose a pretrial firearms restriction on a defendant who had previously been convicted of a felony"). For instance, given *Heller*'s statement (repeated in *Bruen*) that the Second Amendment affords no right to carry "dangerous and unusual weapons," 554 U.S. at 627, the amendment would not bar prosecuting someone who obtained such a weapon while under indictment. Nor would the amendment bar prosecuting an indicted defendant who obtained a gun to facilitate his escape since *Heller* "described the right protected by the Second Amendment as 'bearing arms for a *lawful* purpose.'" *Id.* at 620 (emphasis added).

Section 922(n) is constitutional as applied to Sanchez. Sanchez was previously indicted for aggravated robbery, a serious violent felony. (ROA.9.) *See United States v. Jackson*, 30 F.4th 269, 275 (5th Cir. 2022) (holding that Texas aggravated robbery is an ACCA violent felony). No historical account suggests that the founders would have preserved such a defendant's right to receive guns. To the contrary, probable cause to believe that Sanchez committed aggravated robbery is sufficient to exclude him

from the political community entitled to bear arms, *see supra*, Parts I, II, and places him squarely within the historical traditions of restricting the gun rights of accused and otherwise dangerous individuals, *see supra*, Part III. The conduct that led to Sanchez's arrest in this case reinforces the policy decision to prohibit violent criminal defendants from receiving guns: he was identified as a suspect in a shooting that killed one person and injured another. (ROA.8.) Thus, § 922(n) could be constitutionally applied to Sanchez.

## CONCLUSION

This Court should reverse the district court's order dismissing Sanchez's indictment.

Respectfully submitted,

JAIME ESPARZA
United States Attorney

*/s/ Charles E. Fowler, Jr.*
CHARLES E. FOWLER, JR.
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I certify that on May 10, 2023, I filed this brief through this Court's electronic case-filing system, which will serve it on all registered counsel.

*/s/ Charles E. Fowler, Jr.*
CHARLES E. FOWLER, JR.
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

I certify that

1. this brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,800 words, excluding the parts exempted by Rule 32(f); and

2. this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Office Word 365 in size 14 Calisto MT font.

Dated: May 10, 2023

*/s/ Charles E. Fowler, Jr.*
CHARLES E. FOWLER, JR.
Assistant United States Attorney