# No. 22-51078

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

SAMUEL ADAM SANCHEZ-TENA,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Western District of Texas

———————————

**Brief of Defendant-Appellee**

———————————

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206
Tel.: (210) 472-6700
Fax: (210) 472-4454

TIMOTHY M. SHEPHERD
Assistant Federal Public Defender

*Attorney for Defendant-Appellee*

## Certificate of Interested Persons

### UNITED STATES v. SAMUEL ADAM SANCHEZ-TENA, No. 22-51078

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. **Samuel Adam Sanchez-Tena,** Defendant-Appellee;

2. **Jaime Esparza,** U.S. Attorney;

3. **Ashley C. Hoff,** former U.S. Attorney;

4. **Brandi Young,** Assistant U.S. Attorney, who represented Plaintiff-Appellant in the district court;

5. **Maureen Scott Franco,** Federal Public Defender;

6. **Anthony J. Colton,** Assistant Federal Public Defender, who represented Defendant-Appellee in the district court; and

7. **Timothy M. Shepherd,** Assistant Federal Public Defender, who represents Defendant-Appellee in this Court.

s/ Timothy M. Shepherd
TIMOTHY M. SHEPHERD
*Attorney for Defendant-Appellee*

i

## Statement Regarding Oral Argument

Whether 18 U.S.C. § 922(n) violates the Second Amendment is an issue of first impression that has divided district courts. This Court heard oral argument on the issue in *United States v. Quiroz*, No. 22-50834 (5th Cir.), in February but has not yet issued a decision. And this case has not been stayed pending a decision in *Quiroz*. Sanchez requests oral argument to answer any additional questions the Court may have.

# Table of Contents

Certificate of Interested Persons...................................................... i

Statement Regarding Oral Argument............................................. ii

Table of Authorities............................................................. v

Issue Presented for Review .......................................................... 1

Summary of the Argument ..................................................... 2

Arguments and Authorities ........................................................... 5

    Section 922(n) violates the Second Amendment, and the
district court's dismissal should be affirmed. ........................... 5

    A. *Bruen* established a new analytical framework for
analyzing Second Amendment challenges. ......................... 5

    B. The *Bruen* framework applies to Sanchez's Second
Amendment challenge. ....................................................... 7

    C. The Second Amendment's plain text covers the conduct
prohibited by § 922(n). ...................................................... 10

        1. Firearm receipt is covered by the Second
Amendment's plain text. .............................................. 10

        2. Those under indictment are included in "the people"
protected by the Second Amendment............................11

    D. The Government has not shown that § 922(n) is
"consistent with the Nation's historical tradition of
firearm regulation." .......................................................... 25

        1. Bruen requires the Government to provide
founding-era historical firearm regulations that are
"distinctly" or "relevantly" similar to § 922(n)............. 25

2.   The Government fails to point to any evidence of
     founding-era firearms restrictions for those under
     indictment......................................................................... 28

3.   The Government's proffered historical analogues
     are not "relevantly similar" to § 922(n) under
     *Bruen.* ............................................................................. 32

E.  The district court correctly held that § 922(n) is facially
    unconstitutional. ................................................................... 61

1. Section 922(n) facially violates the Second
   Amendment under the framework announced in
   *Bruen.* .............................................................................. 61

2. The district court did not plainly err by analyzing
   § 922(n) facially............................................................... 63

Conclusion........................................................................................ 65

Certificate of Compliance with Type-Volume Limit...................... 66

# Table of Authorities

## Cases

*Agnello v. United States,*
　269 U.S. 20 (1925) ................................................... 49

*Bell v. Wolfish,*
　441 U.S. 520 (1979) ........................................*passim*

*Buchanan v. Alexander,*
　919 F.3d 847 (5th Cir. 2019) ................................ 64

*Chimel v. California,*
　395 U.S. 752 (1969) ................................................ 49

*City of Los Angeles, Calif. v. Patel,*
　576 U.S. 409 (2015) ......................................... 62, 63

*Coffin v. United States,*
　156 U.S. 432 (1895) ................................................ 20

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,*
　489 U.S. 189 (1989) ................................................ 40

*District of Columbia v. Heller,*
　554 U.S. 570 (2008) ........................................*passim*

*Ex parte Milburn,*
　34 U.S. (9 Pet.) 704 (1835) ................................. 47

*Firearms Pol'y Coal., Inc. v. McCraw,*
　__F. Supp. 3d __, 2022 WL 3656996
　(N.D. Tex. Aug. 25, 2022) ................................... 31

*Freedom Path, Inc. v. Internal Revenue Serv.,*
　913 F.3d 503 (5th Cir. 2019) ................................ 62

*Furman v. Georgia,*
　408 U.S. 238 (1972) ................................................ 34

*Gerstein v. Pugh*,
420 U.S. 103 (1975) ............................................................ 23

*Green v. U.S. Dep't of Just.*,
54 F.4th 738 (D.C. Cir. 2022) ....................................... 64

*Harmelin v. Michigan*,
501 U.S. 957 (1991) ............................................................ 34

*Hollis v. Lynch*,
827 F.3d 436 (5th Cir. 2016) ........................................... 6

*Johnson v. United States*,
576 U.S. 591 (2015) ............................................................ 62

*Kaley v. United States*,
571 U.S. 320 (2014) ......................................... 8, 9, 22, 23

*Kanter v. Barr*,
919 F.3d 437 (7th Cir. 2019) ................................. *passim*

*Matter of Cajun Elec. Power Co-op., Inc.*,
109 F.3d 248 (5th Cir. 1997) ....................................... 16

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ....................................... 6, 7, 10

*New York State Rifle and Pistol Association, Inc. v. Bruen*,
142 S. Ct. 2111 (2022) ................................... *passim*

*Range v. Att'y Gen.*,
53 F.4th 262 (3d Cir. 2022), *reh'g en banc granted*,
*opinion vacated*, 56 F.4th 992 (3d Cir. 2023) ................ 19, 21, 54

*Range v. Att'y Gen.*,
69 F.4th 96 (3d Cir. June 6, 2023) (en banc) ....................... *passim*

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
490 U.S. 477 (1989) ........................................................ 9

*Stack v. Boyle*,
342 U.S. 1 (1951) ........................................................ 48

*State v. Buzzard*,
    4 Ark. 18 (1842) ........................................................ 50

*Stimmel v. Sessions*,
    879 F.3d 198 (6th Cir. 2018) ....................................... 13

*Taylor v. Taintor*,
    83 U.S. 366 (1873) ............................................... 44, 45

*United States v. Avants*,
    278 F.3d 510 (5th Cir. 2002) ....................................... 64

*United States v. Bartucci*,
    __ F. Supp. 3d __, 2023 WL 2189530
    (E.D. Cal. Feb. 23, 2023) ........................................... 24

*United States v. Black*,
    2023 WL 122920 (W.D. La. Jan. 6, 2023) ................................. 18

*United States v. Castillo*,
    386 F.3d 632 (5th Cir. 2004) ....................................... 65

*United States v. Faulkner*,
    488 F.2d 328 (5th Cir. 1974) ....................................... 20

*United States v. Fencl*,
    No. 21-cr-3101-JLS, 2022 WL 17486363
    (S.D. Cal. Dec. 7, 2022) ........................................... 25

*United States v. Gore*,
    2023 WL 2141032 (S.D. Ohio Feb. 21, 2023) ........................... 24

*United States v. Hicks*,
    __ F. Supp. 3d __, 2023 WL 164170
    (W.D. Tex. Jan. 9, 2023).......................................*passim*

*United States v. Hill*,
    35 F.4th 366 (5th Cir. 2022) ....................................... 64

*United States v. Jackson*,
    2023 WL 2499856 (D. Md. Mar. 13, 2023) ............................. 24

*United States v. Jimenez-Shilon,*
   34 F.4th 1042 (11th Cir. 2022) ................................................... 14

*United States v. McDaniel,*
   No. 22-cr-176, ECF No. 53 (E.D. Wis. May 3, 2023) ............. 5, 17

*United States v. McGinnis,*
   956 F.3d 747 (5th Cir. 2020) ..................................................... 6, 7

*United States v. Melendrez-Machado,*
   2023 WL 4003508 (W.D. Tex. June 14, 2023) ........................... 17

*United States v. Miller,*
   307 U.S. 174 (1939) .................................................................... 30

*United States v. Now,*
   2023 WL 2717517 (E.D. Wis. Mar. 15, 2023) ........................... 24

*United States v. Olano,*
   507 U.S. 725 (2009) ............................................................... 63, 65

*United States v. Perez-Garcia,*
   __ F. Supp. 3d __, 2022 WL 17477918
   (S.D. Cal. Dec. 6, 2022) ............................................................. 25

*United States v. Perez-Garcia,*
   __ F. Supp. 3d __, 2022 WL 4351967
   (S.D. Cal. Sept. 18, 2022) .......................................................... 25

*United States v. Posada,*
   __ F. Supp. 3d __, 2023 WL 3027877
   (W.D. Tex. Apr. 20, 2023) .......................................................... 24

*United States v. Quiroz,*
   __ F. Supp. 3d __, 2022 WL 4352482
   (W.D. Tex. Sept. 19, 2022) ...................................................... 5, 11

*United States v. Rahimi,*
   61 F.4th 443 (5th Cir. 2023) ............................................. *passim*

*United States v. Reaves,*
   No. 4:22-cr-224, ECF No. 55 (E.D. Mo. Jan. 9, 2023) .................. 5

*United States v. Rowson,*
  __ F. Supp. 3d __, 2023 WL 431037
  (S.D.N.Y. Jan. 26, 2023) .................................................... 9, 18

*United States v. Salerno,*
  481 U.S. 739 (1987) ...........................................*passim*

*United States v. Sanchez,*
  2022 WL 17815116 (W.D. Tex. Dec. 19, 2022).......................... 21

*United States v. Scott,*
  450 F.3d 863 (9th Cir. 2006) ....................................... 41

*United States v. Sitladeen,*
  64 F.4th 978 (8th Cir. 2023) ....................................... 17

*United States v. Skoien,*
  614 F.3d 638 (7th Cir. 2010) ....................................... 17

*United States v. Vongxay,*
  594 F.3d 1111 (9th Cir. 2010) ...................................... 19

*Young v. Hawaii,*
  896 F.3d 1044 (9th Cir. 2018) ...................................... 50

**Constitutional Provisions**

U.S. Const. amend. I.............................................8, 11, 13, 22

U.S. Const. amend. II ...........................................*passim*

U.S. Const. amend. IV ..........................................*passim*

U.S. Const. amend. V ............................................. 8

U.S. Const. amend. VI ............................................ 8

U.S. Const. amend. VIII .......................................... 8

U.S. Const. amend. IX ........................................... 11

U.S. Const. amend. XIV.......................................... 26

N.H. Const., Pt. I, Art. XVIII (1784)................................................ 34

**Statutes**

18 U.S.C. § 922(g)(1) ............................................................. 21, 56

18 U.S.C. § 922(g)(3) ................................................................. 21

18 U.S.C. § 922(g)(8) ....................................................... 53, 57, 60

18 U.S.C. § 922(n) ............................................................ *passim*

18 U.S.C. § 3142(c)(1)(B)(viii) ...................................................... 25

18 U.S.C. § 3142(e) .................................................................. 23

21 U.S.C. § 853(e)(2) ................................................................ 23

Act of Apr. 4, 1786, 1 N.Y. Laws 227–36 (T. Greenleaf 1792) ....... 30

Act of Dec. 28, 1792, ch. 33, 6 N.H. Laws 84–92 (1917)............... 30

Act of Feb. 15, 1791, ch. 74, 5 N.H. Laws 687–88
    (H.H. Metcalf 1916) ..................................................... 43

Act of Mar. 20, 1780, ch. 902, 5 Pa. Stat. 144–73
    (J. Mitchell & H. Flanders comm'rs 1904)................................. 30

Bail Reform Act of 1984, Pub. L. No. 98-473,
    98 Stat. 1976 (1984) ...................................................... 46, 48

Crimes Act, 1 Cong. Ch. 9, 1 Stat. 112 (1790) ........................ 33, 34

District of Columbia Court Reform and Criminal Procedures
    Act of 1970, Pub.L. No. 91-358, 84 Stat. 531 (1970)................. 48

Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e),
    52 Stat. 1250 (repealed) ............................................................ 29

Judiciary Act, 1 Stat. 73 (1789) ..................................................... 35

Militia Act of 1662, 13 & 14 Car. 2, c.3 (Eng.)............................... 54

Second Militia Act, 1 Stat. 271 (May 8, 1792) ................................ 30

**Rules**

Fed. R. App. P. 32(a)(5) ................................................................. 66

Fed. R. App. P. 32(a)(6) ................................................................. 66

Fed. R. App. P. 32(a)(7)(B) ............................................................ 66

Fed. R. App. P. 32(f) ..................................................................... 66

Fed. R. Crim. P. 5(a)(1)(A) ............................................................ 51

Fed. R. Crim. P. 52(a) ................................................................... 64

Fed. R. Crim. P. 52(b) ................................................................... 64

**Other Authorities**

Adam Winkler, GUNFIGHT (2013) .................................................. 31

Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551
(2009) ....................................................................................... 17

Alexa Van Brunt & Locke E. Bowman, *Toward a Just Model
of Pretrial Release: A History of Bail Reform and a
Prescription for What's Next*,
108 J. Crim. L. & Criminology 701, (2018) ................... 44, 46, 48

Betsy Kushlan Wanger, *Limiting Preventive Detention Through
Conditional Release: The Unfulfilled Promise of the 1982
Pretrial Services Act*, 97 Yale L.J. 320 (1987) ........................... 45

Black's Law Dictionary (11th ed. 2019) ........................................ 43

Caleb Foote, *The Coming Constitutional Crisis in Bail: I*,
113 U. Pa. L. Rev. 959 (1965) .................................................... 37

Charles Petersdorff, A PRACTICAL TREATISE ON THE LAW OF
BAIL IN CIVIL AND CRIMINAL PROCEEDINGS (1824) ...................... 45

Donald B. Verrilli, Jr., *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328 (1982)......................................... 35, 36, 37

Dr. Robert Schehr, *Standard of Proof, Presumption of Innocence, and Plea Bargaining: How Wrongful Conviction Data Exposes Inadequate Pre-Trial Criminal Procedure*, 54 Cal. W. L. Rev. 51 (2017)......................................................... 38

Horatio Marbury & William H. Crawford, DIGEST OF THE LAWS OF THE STATE OF GEORGIA (1802)................................. 30, 43

John F. Duffy & Richard M. Hynes, *Asymmetric Subsidies and the Bail Crisis*, 88 U. Chi. L. Rev. 1285 (2021)................... 43

John S. Goldkamp, *Danger and Detention: A Second Generation of Bail Reform*, 76 J. Crim. L. & Criminology 1 (1985)................................. 46, 48

Joyce Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994)................................... 29

Laura I. Appleman, *Justice in the Shadowlands: Pretrial Detention, Punishment, & the Sixth Amendment*, 69 Wash. & Lee L. Rev. 1297 (2012).......................................... 45

Laurence H. Tribe, *An Ounce of Detention: Preventative Justice in the World of John Mitchell*, 56 Va. L. Rev. 371 (1970) .......... 41

Lauryn P. Gouldin, *Disentangling Flight Risk from Dangerousness*, 2016 B.Y.U. L. Rev. 837 (2016)................... 41, 48

Matthew J. Hegreness, *America's Fundamental and Vanishing Right to Bail*, 55 Ariz. L. Rev. 909 (2013) .......................................36, 43, 44, 45

Michael Harwin, *Detaining for Danger Under the Bail Reform Act of 1984: Paradoxes of Procedure and Proof*, 35 Ariz. L. Rev. 1091 (1993)....................................................... 48

Michael Waldman, THE SECOND AMENDMENT: A BIOGRAPHY (2014) ...................................................................... 50

Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343 (2009) ............................ 17

Nicholas J. Johnson, et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (3d ed. 2022) ............................................................17, 29, 30, 31

Paul Lermack, *The Law of Recognizances in Colonial Pennsylvania*, 50 Temp. L.Q. 475 (1976–77) ..................... *passim*

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139 (2007)..................................... 54, 55, 57

Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*, 25 Tex. Rev. L. & Pol. 245 (2021)............................ 30

Stephen P. Halbrook, THE RIGHT TO BEAR ARMS  (2021) ............... 31

Thomas F. Davidson, *The Power of Courts to Let to Bail*, 24 Am. L. Reg. 1 (1876) ........................................................ 38, 41

Thomas Herty, DIGEST OF THE LAWS OF MARYLAND (1799)............ 30

Timothy R. Schnacke, *A Brief History of Bail*, Judges' J. (Summer 2018) ............................................................................. 36

Timothy R. Schnacke, Michael R. Jones, & Claire M.B. Brooker, *The History of Bail and Pretrial Release*, Pretrial Justice Institute (Sept. 23, 2010) .......................................................... 46

William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND (1765) ......................................................................................... 42

William F. Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb. L. Rev. 33 (1977)..............................36, 37, 38, 44

William Ortman, *Probable Cause Revisited*, 68 Stan. L. Rev. 511 (2016)........................................................ 38

## Issue Presented for Review

Whether the district court correctly held that 18 U.S.C. § 922(n) violates the Second Amendment under *New York State Rifle and Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

## Summary of the Argument

**Section 922(n) violates the Second Amendment, and the district court's dismissal should be affirmed.**

Under the new analytical framework established in *New York State Rifle and Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the district court correctly held that 18 U.S.C. § 922(n)—which prohibits someone under felony indictment from receiving a firearm—violates the Second Amendment. This new framework asks: (1) does the Second Amendment's plain text cover an individual's conduct?, and (2) has the Government demonstrated that the regulation is consistent with the Nation's historical tradition of firearm regulation? *Id.* at 2126.

On *Bruen*'s first step, § 922(n) conduct is protected by the plain text of the Second Amendment. Receipt of a firearm impacts the core right to bear arms. And the Second Amendment extends to "the people" without limitation. It does not exclude those under indictment. The Government's arguments to the contrary are unavailing. Even if the Government could insert a "law-abiding" requirement not found in the text of the Second Amendment, indictees are necessarily "law-abiding" because they are innocent until proven guilty.

On step two, the Government fails to show a historical tradition from the founding like § 922(n). To the contrary, indictees were likely *required* to maintain firearms at the founding. The absence of "distinctly similar" laws like § 922(n) demonstrates the statute is inconsistent with the Nation's historical tradition of firearm regulation. And the Government's proffered "relevantly similar" historical analogues—(1) pretrial detention, (2) pretrial release sureties, (3) firearm seizure incident to arrest, (4) laws purportedly disarming "dangerous or untrustworthy" people, and (5) surety-of-the-peace laws—are not only insufficiently similar to § 922(n), but much of this evidence has already been rejected as ahistorical or dubious by this Court or the Supreme Court.

The Government's alternative arguments also fail. The Government erroneously suggests that this Court disregard *Bruen* and reframe Sanchez's challenge under a due process framework. The Court cannot do so. The Government also argues that the district court failed to apply the appropriate standard for a facial challenge, but this argument is foreclosed in this Court and would prohibit the very challenge brought in *Bruen*. The Government also claims that the district court erred by finding § 922(n) facially unconstitutional instead of first considering it as-applied. The Government failed to

raise this argument below and cannot show that any purported error was plain.

## Arguments and Authorities

## Section 922(n) violates the Second Amendment, and the district court's dismissal should be affirmed.

Section 922(n) criminalizes firearm receipt by any person under indictment for a crime punishable by more than a year. Under the new framework announced in *Bruen*, the district court correctly held that § 922(n) violates the Second Amendment. ROA.88–89. This Court should affirm the district court's order dismissing the indictment.[1]

### A. *Bruen* established a new analytical framework for analyzing Second Amendment challenges.

The Second Amendment to the United States Constitution mandates that a "well regulated militia, being necessary to the security

---

[1] Courts are deeply divided on this question. The Government characterizes the 11 cases upholding § 922(n) since *Bruen* as a "chorus," while dismissing contrary decisions as a "few stark outliers." Gov't Br. 8–9. At least five different courts have, however, found that § 922(n) violates the Second Amendment. *See United States v. Hicks*, __ F. Supp. 3d __, 2023 WL 164170 (W.D. Tex. Jan. 9, 2023); *United States v. Stambaugh*, __ F. Supp. 3d __, 2022 WL 16936043 (W.D. Okla. Nov. 14, 2022); *United States v. Quiroz*, __ F. Supp. 3d __, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022); *see also United States v. McDaniel*, No. 22-cr-176, ECF No. 53 (E.D. Wis. May 3, 2023); *United States v. Reaves*, No. 4:22-cr-224, ECF No. 55 (E.D. Mo. Jan. 9, 2023). These are not mere outliers.

of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment codified an individual right to possess and carry weapons, the core purpose of which is self-defense in the home. 554 U.S. 570, 628 (2008); *see also McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010).

After *Heller*, this Court "adopted a two-step inquiry for analyzing laws that might impact the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016). At the first step, courts asked "whether the conduct at issue falls within the scope of the Second Amendment right." *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020) (cleaned up). This involved determining "whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* at 754. If the conduct was outside the scope of the Second Amendment, then the law was constitutional. *Id.* Otherwise, courts proceeded to the second step to determine whether to apply strict or intermediate scrutiny. *Id.*

In *Bruen*, the Supreme Court announced a new framework for analyzing Second Amendment claims. The Court rejected the second step of the two-step inquiry adopted by this Court and others

because "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Bruen*, 142 S. Ct. at 2127. The Supreme Court reasoned that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id*.

Under the new framework, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2126. The Government then "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. If the Government cannot make that showing, then the regulation is unconstitutional. *Id*.

## B. The *Bruen* framework applies to Sanchez's Second Amendment challenge.

The Government first argues that this Court should ignore *Bruen* in considering Sanchez's Second Amendment challenge. Gov't Br. 11–15. The argument is wholly without merit.

Even before *Bruen,* Second Amendment challenges were, of course, considered under the existing Second Amendment framework. *See, e.g.*, *McGinnis*, 956 F.3d 747. And this Court recognized

that *Bruen* "clearly" and "fundamentally" changed the "analysis of laws that implicate the Second Amendment." *United States v. Rahimi*, 61 F.4th 443, 450 (5th Cir. 2023). Sanchez challenged § 922(n) under the Second Amendment. Thus, *Bruen* applies. The Government offers no meaningful explanation for why the *Bruen* framework applies to Second Amendment challenges like *Bruen* and *Rahimi*, but should not apply here.

The Government attempts to dodge *Bruen* and recast Sanchez's Second Amendment challenge by relying on caselaw addressing *other* constitutional rights. Gov't Br. 11. It reasons that, because he is an indictee, his challenge is more like other pretrial constitutional challenges. Gov't Br. 14. But Sanchez is not raising a challenge under the Fourth, Fifth, or Sixth Amendments, *see* Gov't Br 12 (citing *Kaley v. United States*, 571 U.S. 320, 329 (2014)); nor under the Eighth Amendment, *see* Gov't Br. 13 (citing *United States v. Salerno*, 481 U.S. 739, 754–55 (1987)); nor under the First Amendment, *see* Gov't Br. 13 (citing *Bell v. Wolfish*, 441 U.S. 520, 550 (1979)). So, *Kaley*, *Salerno*, and *Bell* do not have "direct application" in this case, as the Government argues. *See* Gov't Br. 14 (quoting *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484

(1989)). The Government's binary view of constitutionality misunderstands that a law can violate one constitutional right and not another.

Moreover, the Government asks the Court to disregard the central holding of *Bruen*: that means-end scrutiny does not apply to Second Amendment challenges. *See Bruen*, 142 S. Ct. at 2127–29. Each of the cases cited by the Government applied some form of means-end scrutiny. *See Kaley*, 571 U.S. at 323, 327, 334–39; *Salerno*, 481 U.S. 749–51; *Bell*, 441 U.S. at 552, 559, 560. So does the Government. *See* Gov't Br. 14 (weighing the government's regulatory interest against Sanchez's liberty interest). Courts have rejected similar Government attempts to recast Second Amendment challenges, for this reason. *See, e.g.*, *United States v. Rowson*, __ F. Supp. 3d __, 2023 WL 431037, at *13–14 (S.D.N.Y. Jan. 26, 2023).

The Government's assertion that *Bruen* did not overturn these unrelated cases ignores the obvious: they are not Second Amendment cases. *See* Gov't Br. 14. For Sanchez's Second Amendment claim, the Court must apply the *Bruen* framework. *See Rahimi*, 61 F.4th at 450–54.

**C. The Second Amendment's plain text covers the conduct prohibited by § 922(n).**

Turning to *Bruen*'s first step, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S. Ct. at 2129–30. Section 922(n) prevents those under indictment from receiving firearms, a necessary precursor to the fundamental right to possess firearms for self-defense. Under the plain text of the Second Amendment, it is presumptively unconstitutional. *See id.*

1. Firearm receipt is covered by the Second Amendment's plain text.

The sole question at this first stage of the *Bruen* analysis is whether the relevant "conduct" is covered by the plain text of the Second Amendment. *Id.* at 2126. The conduct prohibited by § 922(n)—receipt of a firearm—is clearly covered by "the right of the people to keep and bear arms." U.S. Const. amend. II. Receipt itself—and as a necessary precursor to possession—impacts the core Second Amendment right to possess a firearm for self-defense. *See United States v. Laurent*, 861 F. Supp. 2d 71, 85 (E.D.N.Y. 2011); *see also McDonald*, 561 U.S. at 767; *Bruen*, 142 S. Ct. 2111.

    2. <u>Those under indictment are included in "the people" pro-<br>tected by the Second Amendment.</u>

The district court correctly held that the question of a person's status, as an indictee or otherwise, is irrelevant to this stage of the *Bruen* framework. <u>ROA.88</u>.[2] The Government, however, argues the plain text of the Second Amendment does not apply to § 922(n) conduct because those under indictment are not "law-abiding." Gov't Br<u>. 15–27</u>. It is wrong.

    a. <u>*"The people" protected by the Second Amendment is not limited to "law-abiding" citizens*</u>.

The Second Amendment covers all citizens by conferring the right "to keep and bear arms" on "the people." <u>U.S. Const. amend. II</u>. The plain text does not limit who is included in "the people." The Supreme Court has explained that when the Constitution refers to "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset" and that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, <u>554 U.S. at 580</u>–81. Like the First, Fourth, and Ninth Amendments, the Second

---

    [2] The district court incorporated its reasoning from *Quiroz*, <u>2022 WL 4352482</u>.

Amendment codified an individual right, as opposed to "collective" actions like voting. *Id.* at 579–80. Individual rights extend to "the people," or a "class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of the community." *Id.* at 580.

The Government rejects the plain text of the Second Amendment and *Heller*. It argues that step one requires consideration of status, because the Second Amendment applies only to law-abiding, responsible citizens, a category it claims excludes those under indictment. Gov't Br. 15–27. According to the Government, the *Bruen* "Court explicitly, repeatedly described the right as belonging only to law-abiding citizens." Gov't Br. 17.

But the Second Amendment says nothing about "law-abiding" citizens. And *Bruen* never said the right belongs *only* to law-abiding citizens, only that it was undisputed that the petitioners, who were "two ordinary, law-abiding, adult citizens—are part of 'the people.'" 142 S. Ct. at 2134. The Government's reading would conflict with *Bruen*'s language that the "Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Id.* at 2156.

Nor did *Heller* hold that "the people" is limited to "law-abiding" citizens. *See* 554 U.S. at 635; *see also Stimmel v. Sessions*, 879 F.3d 198, 204–05 (6th Cir. 2018) (finding *Heller* "conclusively established [that] the Second Amendment applies to law-abiding and peaceable citizens *at the very least*") (emphasis added). The Government's reading conflicts with *Heller*'s plain directive that the Second Amendment, like the First and Fourth Amendments, applies to "all Americans." 554 U.S. at 579–81. Categorically excluding indictees from the plain text of the Second Amendment would, therefore, endanger their basic protections under the First and Fourth Amendment. *See Range v. Att'y Gen.*, 69 F.4th 96, 101–02 (3d Cir. June 6, 2023) (en banc). Otherwise, such a rule would run afoul of *Bruen*'s directive that the Second Amendment is "not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." 142 S. Ct. at 2156 (cleaned up).

Justice Barrett—who joined the majority in *Bruen*—has explained that a person's status is properly considered in the question of historical tradition (what would now be step two of *Bruen*), rather than the existence of the right (step one). In *Kanter v. Barr*, then-Judge Barrett reasoned that, under *Heller*, the word "people" refers to "all Americans" and even those who can be lawfully restricted are

13

not "categorically excluded from our national community." 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 142 S. Ct. 2111. The "question is whether the government has the power to *disable* the exercise of a right that they otherwise possess, rather than whether they possess the right at all." *Id.* (emphasis added); *cf. United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045–46 (11th Cir. 2022) (interpreting *Heller* to say that felons and others who could be disarmed are still part of "the people" protected by the Constitution). Thus, a person's status is properly considered in the historical tradition inquiry, not in whether the person has a Second Amendment right. *Kanter*, 919 F.3d at 451–52.

This Court agreed with now-Justice Barrett and rejected the Government's "law-abiding" gloss on "the people" in *Rahimi*. 61 F.4th at 451–53. It reiterated *Heller*'s "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 451. It held that the Government's argument—the same one it raises here—runs "headlong into *Heller* and *Bruen*." *Id.* at 452. And it endorsed Justice Barrett's reasoning that any "law-abiding" qualifier would relate to the power to restrict a right, not the scope of the right itself. *Id.* at 451–52 (explaining that

*Heller* and *Bruen* "espouse" the Justice Barrett approach from *Kanter*). The Court explained that the Government's imposition of this gloss onto the scope of the right "turns the typical way of conceptualizing constitutional rights on its head," because a person could be "readily divested" of the right—"in one day and out the next." 61 F.4th at 452–53 (citing *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting)). It further noted that the "Government's proffered interpretation of 'law-abiding' admits to no true limiting principle." *Id*. at 453. For these reasons, the Court concluded "Rahimi, while hardly a model citizen, is nonetheless among "the people entitled to the Second Amendment's guarantees, all other things equal." *Id*.

Recognizing that *Rahimi* is fatal to its step-one argument, the Government argues that *Rahimi* was wrongly decided and misconstrues its holding. Gov't Br. 23. Of course, this Court is bound by *Rahimi*. And *Rahimi* does not stand for the proposition the Government urges. While *Rahimi* rejected the Government's proposed

"gloss," it also included somewhat confusing dicta.[3] The Court explained that *Heller*'s use of "'law-abiding, responsible' citizens meant to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights," as identified in its list of "longstanding prohibitions." *Id.* at 452. The Government reads this to suggest that some groups could be excluded from the "'political community within the amendment's scope.'" Gov't Br. 24 (citing *Rahimi,* 61 F.4th at 452). This is simply not what *Rahimi* says.[4]

Any such "exclusion" would be as part of *Bruen*'s second step, which examines the historical power to restrict firearms. Both longstanding prohibitions and groups historically stripped of their

---

[3] The analysis that led to the *Rahimi* Court concluding that Mr. Rahimi was protected by the Second Amendment is essential to its ultimate holding, while the discussion about "law-abiding citizens" is dicta because it could be excised without impairing the outcome. *See Matter of Cajun Elec. Power Co-op., Inc.,* 109 F.3d 248, 256 (5th Cir. 1997).

[4] The Government draws language from separate sentences in *Rahimi* on this point. Gov't Br. 24. In fact, the Court explained only that Rahimi's restraining order "does not suffice to remove him from the political community within the amendment's scope." *Rahimi,* 61 F.4th at 452. Nowhere does *Rahimi* state what the Government claims, Gov't Br. 24—that those subject to "longstanding prohibitions" are "excluded" from the scope of the Second Amendment.

rights involve a *historical* analysis.[5] So to the extent the Supreme Court's "law-abiding" qualifier impacts the analysis to exclude certain groups from the protections of the Second Amendment, it must happen at step two of the *Bruen* analysis, not at step one. *See United States v. Sitladeen*, 64 F.4th 978, 986 (8th Cir. 2023) (reading *Rahimi* to require consideration of a person's status at the historical, second step of *Bruen*); *United States v. Melendrez-Machado*, 2023 WL 4003508, at *3–4 (W.D. Tex. June 14, 2023) (same); *United States v. McDaniel*, No. 22-cr-176, ECF No. 53 at 7 (E.D. Wis. May 3, 2023) (same). The Government's alternative reading would di-

---

[5] In referring to "longstanding prohibitions," the *Heller* Court never suggested that these prohibitions would be exempt from historical scrutiny. To the contrary, *Heller* explained "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." 554 U.S. at 635. And courts will need to take a hard look at the historical justifications for those supposedly longstanding prohibitions. The Court's "longstanding prohibitions" dicta has been subject to considerable criticism for its failure to provide any historical basis. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010); Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1567 (2009); *see also* Nicholas J. Johnson, et al, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 855 (3d ed. 2022); Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1356-57 (2009).

rectly contradict *Rahimi*'s reiteration of *Heller*, endorsement of Justice Barrett's approach, and rejection of the "law-abiding" gloss proffered by the Government. *See* 61 F.4th at 451–53.

The Government also argues that the "majority of courts" instruct that the Second Amendment only applies to "law-abiding" citizens. Gov't Br. 21; *see also* Gov't Br. 16–17, 21–23. The position is dubious.[6] Countless opinions have held the opposite. *See, e.g.*, *Rowson*, 2023 WL 431037, at *17–19 (listing cases). And no court has taken the Government's position in the § 922(n) context. *See infra* Section C.2.b.

Moreover, the primary case the Government cites to has since been reversed en banc on this exact issue. *See Range v. Att'y Gen.*, 53 F.4th 262 (3d Cir. 2022), *reh'g en banc granted, opinion vacated*,

---

[6] The Government cites to *United States v. Black*, 2023 WL 122920, at *3 (W.D. La. Jan. 6, 2023), for this position. But *Black*'s support for this "majority" is a comparison of four cases—including a vacated opinion—limiting the Second Amendment to law-abiding citizens, to three cases holding the opposite. *Id.*

56 F.4th 992 (3d Cir. 2023).[7] The Third Circuit rehearing *Range* en banc "reject[ed] the Government's contention that only 'law-abiding, responsible citizens' are counted among 'the people' protected by the Second Amendment." *Range*, 69 F.4th at 103. The court explained that the "law-abiding" language from *Heller* and *Bruen* was dicta, and that the Government's reading would endanger other constitutional rights, was unworkably vague, and amounted to prohibited deference to legislatures. *Id.* at 101–03.[8]

---

[7] The vacated *Range* opinion, like the pre-*Bruen* cases cited by the Government, excluded felons from "the people" by conflating the textual and historical inquiries, which are now separate steps under *Bruen*. *See* 53 F.4th at 269 (incorrectly stating *Bruen* directed courts to consider the Second Amendment's text and the Nation's historical traditions "in a single step"); *see also Medina v. Whitaker*, 913 F.3d 152, 158–60 (D.C. Cir. 2019); *United States v. Vongxay*, 594 F.3d 1111, 1116–18 (9th Cir. 2010).

[8] The Government's remaining arguments that indictees are not included in "the people" are likewise unavailing and frequently misstate or conflate the two *Bruen* steps. For example, *Bruen*'s failure to find "shall-issue" licensing regimes unconstitutional is not an endorsement of each component of those laws and in no way suggests that only "law-abiding" people are protected by the Second Amendment. *See* Gov't Br. 19–20. *Bruen* declined to "rule out constitutional challenges to shall-issue regimes[.]" 142 S. Ct. at 2138 n.9. And it made this point in a footnote about *historical analysis*, so it does not suggest that the "law-abiding" question must be addressed at step one. Nor does *Bruen*'s use of the word "presumptively" in step one, and *Heller*'s use of "presumptively lawful" to describe longstanding prohibitions on felons, imply that the "law-abiding" question must be considered at step one of *Bruen*. *See* Gov't Br. 19.

The district court correctly found that a person's status should not be considered at step one of *Bruen*.

> b. *Those under indictment cannot be categorically excluded from "law-abiding" citizens.*

Even if the Second Amendment was read to apply only to "law-abiding" citizens, that definition does not exclude indictees.

Indictees are, by definition, "law-abiding." *United States v. Laurent*, 861 F. Supp. 2d 71, 102 (E.D.N.Y. 2011); *cf. Coffin v. United States*, 156 U.S. 432, 453 (1895) ("innocence is established until sufficient evidence is introduced to overcome the proof which the law has created"). The "indictment itself is not any evidence whatever of guilt," but "merely a means of method of getting a case into court and of informing the defendant of the nature of the charge against him." *United States v. Faulkner*, 488 F.2d 328, 331 (5th Cir. 1974). "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin*, 156 U.S. at 453. A declaration that a person

under indictment is not "law-abiding" necessarily presumes *guilt* rather than *innocence*.[9]

The Government disregards the presumption of innocence and suggests indictees are categorically not "law-abiding" because other courts have held that felons or other categories of people are not "law-abiding." *See* Gov't Br. 24–26 (citing *Range*, 53 F.4th at 280–81 (upholding § 922(g)(1)); *United States v. Sanchez*, 2022 WL 17815116 (W.D. Tex. Dec. 19, 2022) (upholding § 922(g)(3)). But indictees are plainly distinguishable from felons because they have not been convicted, and *Range* has since reversed on this point. 69 F.4th at 103. And the *Sanchez* court subsequently held that the Second Amendment is *not* limited to "law-abiding responsible citizens" when striking down § 922(n). *See United States v. Hicks*, __ F. Supp. 3d __, 2023 WL 164170 (W.D. Tex. Jan. 9, 2023).

_____

[9] The Government notes that the presumption of innocence allocates the burden of proof in criminal trials but does not confer additional rights. Gov't Br. 27; *see also* Gov't Br. 15. The Government misunderstands the issue. The question here is whether indictees are "law-abiding." The Government's assertion to the contrary subverts the trial burden itself by presuming indictees' guilt. Sanchez does not assert that the "presumption of innocence" creates an independent right; he simply argues that it does not exclude him the basic protections of the Constitution.

The Government otherwise argues that indictees are excluded from the Second Amendment because they can have other liberties restricted. Gov't Br. 26; *see also* Gov't Br. 11–15. The Government misunderstands *Bruen* and conflates the existence of a right (step one) and the power to restrict that right (step two). The cases cited by the Government do not say that indictees lack constitutional rights; they specifically hold that people retain constitutional rights pretrial, which can nevertheless be restricted in certain circumstances (usually by applying some form of means-end scrutiny the Supreme Court rejected in *Bruen*). *See Salerno*, 481 U.S. at 748–51 (holding the "individual's strong interest in liberty" was outweighed by the regulatory interest in community safety); *Bell*, 441 U.S. at 545, 550–51, 558–60 (explaining that detainees and prisoners retain First and Fourth Amendment rights, which can be restricted for security concerns). The Government erroneously asserts that *Kaley* recognized that an "indictment 'eliminates' some constitutional liberties." Gov't Br. 13 (citing *Kaley*, 571 U.S. at 327–29). In fact, *Kaley* makes clear that by "eliminate," the Court did not mean extinguishes, but rather that an indictment otherwise *satisfies* a person's "Fourth Amendment right to a prompt judicial assessment of probable cause." *Kaley*, 571 U.S. at 320–21; *see also Gerstein v.*

*Pugh*, 420 U.S. 103, 117 n.19 (1975). Like *Salerno* and *Bell*, *Kaley* does not say that those under indictment are *excluded* from the protections of the Constitution.

Certainly, those under indictment can have some rights impaired, particularly after an additional hearing or finding,[10] but that does not mean that they are no longer protected by the Constitution or, specifically, the Second Amendment. As explained in *Bell*: "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." 441 U.S. at 545. Similarly, indictees continue to be protected by the Constitution, even if those protections may be subject to restrictions. That is, however, a consideration under *Bruen*'s second step.

The Government's framing is also irreconcilable with *Rahimi*. As discussed above, *Rahimi* rejected imposing this "law-abiding" gloss onto *Bruen*'s first step. 61 F.4th at 451–53. But even if certain groups subject to "longstanding prohibitions" could be "exclude[d]

---

[10] The restrictions identified by the Government are only permissible after a hearing or some other showing beyond mere probable cause. *See, e.g.*, 18 U.S.C. § 3142(e); 21 U.S.C. § 853(e)(2).

from the Court's discussion," that could not include indictees. Like Rahimi, Sanchez was only "*suspected* of other criminal conduct at the time, [he] was not a convicted felon or otherwise subject to another 'longstanding prohibition' on the possession of firearms' that would have excluded him." *Id.* at 452. Reading this "longstanding prohibitions" list to exclude unenumerated groups, like indictees, from the protections of the Constitution lacks any "limiting principle," and is precisely what was rejected in *Rahimi. See id.* at 453.

Indeed, "none of the post-*Bruen* decisions that have analyzed the constitutionality of Section 922(n) have followed what the Government proposes." *United States v. Bartucci*, __ F. Supp. 3d __, 2023 WL 2189530, at *5 (E.D. Cal. Feb. 23, 2023).[11]

---

[11] Several courts have assumed without deciding that indictees are protected by the Second Amendment and proceeded to *Bruen*'s second step. *See United States v. Posada*, __ F. Supp. 3d __, 2023 WL 3027877, at *2 (W.D. Tex. Apr. 20, 2023); *United States v. Now*, 2023 WL 2717517, at *5 (E.D. Wis. Mar. 15, 2023); *United States v. Jackson*, 2023 WL 2499856, at *8–9 (D. Md. Mar. 13, 2023). But every other court has expressly rejected the Government's argument. *See, e.g., United States v. Gore*, 2023 WL 2141032, at *2–3 (S.D. Ohio Feb. 21, 2023); *Hicks*, 2023 WL 164170, at *2–3.

**D. The Government has not shown that § 922(n) is "consistent with the Nation's historical tradition of firearm regulation."**

Because the plain text of the Second Amendment covers § 922(n), the Government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. The Government has not met that burden.

1.  Bruen requires the Government to provide founding-era historical firearm regulations that are "distinctly" or "relevantly" similar to § 922(n).

The *Bruen* framework requires the Government to establish that the challenged law "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. It is incumbent on the Government, not the Court, to develop a record of

---

The Government relies on an outlier case addressing another statute to argue those under indictment are not "people" protected by the Constitution. *See* Gov't Br. 26–27 (citing *United States v. Fencl*, 2022 WL 17486363, at *2 (S.D. Cal. Dec. 7, 2022) (addressing 18 U.S.C. § 3142(c)(1)(B)(viii))). The sole case cited for that position in *Fencl* was a magistrate opinion that was not adopted on that issue. *See United States v. Perez-Garcia*, __ F. Supp. 3d __, 2022 WL 4351967 (S.D. Cal. Sept. 18, 2022), *adopted in part by United States v. Perez-Garcia*, __ F. Supp. 3d __, 2022 WL 17477918, *4 (S.D. Cal. Dec. 6, 2022) (rejecting finding that person under indictment is not "law-abiding" because "individuals are presumed innocent until proven guilty").

this historical tradition. *See id*. at 2130 n.6, 2150. And the Government cannot "simply posit that the regulation promotes an important interest." *Id*. at 2126.

"[W]hen it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Id*. at 2136 (quoting *Heller*, <u>554 U.S. at 634</u>–35). "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions change in the intervening years." *Id*.[12] Similarly, the Court explained that "we must also guard against giving postenactment history more weight than it can rightly bear." *Id*.

The Government must show "a tradition of broadly prohibiting" conduct in the manner of the challenged restriction. *Id*. at 2138. In

---

[12] The Fourteenth Amendment was implicated in *Bruen* because it imposes the Second Amendment's pronouncement on a state regulation or law. The Supreme Court did not suggest, for a challenge to a *federal* statute, that regulations from around the passage of the Fourteenth Amendment, or 1868, would carry the same weight as those from around ratification of the Second Amendment, or 1791. *See Bruen*, <u>142 S. Ct. at 2163</u> (Barrett, J., concurring).

other words, the founding-era historical evidence must show a "governmental practice" that has been "open, widespread, and unchallenged since the early days of the Republic." *Id.* at 2137 (cleaned up). The Government cannot rely on "outlier" historical restrictions. *Id.* at 2133, 2156.

And the Government's historical evidence must be sufficiently comparable to the challenged regulation. "[D]etermining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 2132. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry." *Id.* at 2133 (cleaned up). But this approach is "neither a regulatory straightjacket nor a regulatory blank check." *Id.* Moreover, when the challenged regulation addresses a general and persistent societal problem, the "lack of distinctly similar historical regulation," or that "earlier generations addressed the societal problem … through materially different means," are relevant evidence that a

challenged regulation violates the Second Amendment. *Id*. at 2131.[13]

2. The Government fails to point to any evidence of found-ing-era firearms restrictions for those under indictment.

The Government does not identify any laws "distinctly similar" to § 922(n)—laws specifically prohibiting indictees from obtaining firearms. And because § 922(n) "addresses a general societal problem that has persisted since the 18th century," the lack of distinctly similar laws is "relevant evidence" that § 922(n) violates the Second Amendment. *See Bruen*, 142 S. Ct. at 2131.

Even though criminal defendants have been routinely released pretrial with bail since before the founding, *see infra* Section D.3.a,

---

[13] *Rahimi* held that the "core question is whether the challenged law and proffered analogue are 'relevantly similar.'" 61 F.4th at 454. Sanchez, therefore, follows that binding precedent. He maintains, however, that *Rahimi* misstated *Bruen*'s historical inquiry. *Bruen* described two differ-ent approaches. The straightforward approach applies "when a chal-lenged regulation addresses a general societal problem that has per-sisted since the 18th century," and looks for *distinctly* similar historical examples. *See Bruen*, 142 S. Ct. at 2131. The Court followed this ap-proach in *Heller* and *Bruen*. *Id*. The "more nuanced approach," looking to *relevantly* similar historical analogues, applies only to "modern regu-lations that were unimaginable at the founding." *Id*. at 2132. The Third Circuit recently agreed with Sanchez's interpretation. *See Range*, 69 F.4th at 103.

firearm restrictions on them did not arise until the 20th century. "Indictment has historically had a limited effect on an individual's constitutional rights." *Laurent*, <u>861 F. Supp. 2d at 91</u>. The impact was historically limited to detention or release on bail. *See infra* Sections D.3.a, D.3.b The history of barring indicted individuals from receiving firearms is limited and relatively recent. The colonial governments did not disarm indictees, and federal and state governments did not do so until 1938. *See* Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), <u>52 Stat. 1250</u>, <u>1251</u> (repealed).

The lack of historical firearm restrictions on indictees is not surprising. At the founding, the *right* to bear arms was also deeply connected to the historical *duty* to bear arms. *See* Joyce Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 1–10, 138–40 (1994); Nicholas J. Johnson, et al., Firearms Law and the Second Amendment: Regulation, Rights, and Policy 219–22 (3d ed. 2022) [Johnson]. Indeed, the Second Amendment codified an individual right, but the prefatory clause clarifies that the purpose of that right was to "prevent elimination of the militia." *Heller*, <u>554 U.S. at 599</u>. This duty to bear arms was reflected in federal and state laws *requiring* most citizens to keep firearms as part of militia

service. *See, e.g.*, Second Militia Act, § 1, 1 Stat. 271 (May 8, 1792).[14]
These laws "exempted" certain classes of people, but not indictees.
*Id.* § 2, 1 Stat. 272; *cf.* Royce de R. Barondes, *The Odious Intellectual
Company of Authority Restricting Second Amendment Rights to the
"Virtuous"*, 25 Tex. Rev. L. & Pol. 245, 278 (2021) (finding no evi-
dence that those with criminal convictions were excluded from mi-
litia duties or firearm ownership).[15] The colonies generally required
even indentured servants—often convicted criminals—to be armed
for militia service. *See* Johnson 185, 191–92. Countless colonial

---

[14] Congress provided that "each and every free able-bodied white
male citizen of the respective states, resident therein, who is or shall be
of the age of eighteen years, and under the age of forty five years … shall
severally and respectively be enrolled in the militia." Second Militia Act,
§ 1. The Act further required that "every citizen so enrolled … shall,
within six months thereafter, provide himself with a good musket or fire-
lock, a sufficient bayonet and belt," and other related items like ammu-
nition. *Id*.

[15] Similar contemporaneous state militia statutes also did not to ex-
empt felons or those under indictment. *See, e.g.*, Thomas Herty, DIGEST
OF THE LAWS OF MARYLAND 367–73 (1799); Act of Dec. 28, 1792, ch. 33, 6
N.H. Laws 84–92 (1917); Act of Apr. 4, 1786, 1 N.Y. Laws 227–36 (T.
Greenleaf 1792); Act of Mar. 20, 1780, ch. 902, 5 Pa. Stat. 144–73 (J.
Mitchell & H. Flanders comm'rs 1904); Horatio Marbury & William H.
Crawford, DIGEST OF THE LAWS OF THE STATE OF GEORGIA 350 (1802); *cf.*
*United States v. Miller*, 307 U.S. 174, 178–82 (1939) (discussing militia
laws); Johnson 177–89 (in depth discussion about arms requirements for
militia service in each colony).

laws similarly required citizens to keep and carry firearms to and from church, as part of patrol duties, to aid against attacks by Native Americans, or otherwise to defend themselves and their community. *See id.* at 189–91; Stephen P. Halbrook, THE RIGHT TO BEAR ARMS 131–35, 191–98 (2021).

It follows that, while "the Second Amendment is not limited to only those in the militia, it must protect at least the pool of individuals from whom the militia would be drawn." *Firearms Pol'y Coal., Inc. v. McCraw*, __F. Supp. 3d __, 2022 WL 3656996, at *5 (N.D. Tex. Aug. 25, 2022). Disarming indictees would have made little sense to the founders, because it would have effectively relieved them of a civic duty. Despite passing myriad other gun restrictions—early versions of gun registrations, safe storage laws, restrictions on types of firearms, and disarmament of Native Americans, enslaved persons, and religious minorities—the founders never proposed barring indictees from receiving guns or disarming them. *See* Adam Winkler, GUNFIGHT 113–18, 286–87 (2013) (detailing Revolutionary era gun laws and noting absence of restrictions like those from the 20th century). Not only were indictees not disarmed at the founding; they were usually required to own firearms.

3. <u>The Government's proffered historical analogues are not "relevantly similar" to § 922(n) under *Bruen*.</u>

The Government cannot meet its burden under *Bruen* because there is no historical tradition, particularly from the founding era, of disarming those under indictment. The Government identifies several historical examples that it argues are "relevantly similar" to § 922(n): (1) pretrial detention, (2) pretrial release sureties, (3) firearm seizure incident to arrest, (4) a vague collection of laws disarming so-called "dangerous or untrustworthy" people, and (5) surety-of-the-peace laws.[16] Gov't Br. 31–48. Each example fails under *Bruen*.

a. *Pretrial detention is not a historical analogue for § 922(n).*

The Government misplaces reliance on pretrial detention as an analogue for § 922(n). Gov't Br. 31–37. Pretrial detention is not a historical *firearm* regulation, so it is not even relevant to the *Bruen* analysis. Pretrial detention also impacts the inverse population of those released pretrial and subject to § 922(n). The Government's

_____

[16] The Government addressed surety-of-the-peace laws in the district court, ROA.83–85, but its brief only mentions these laws in a footnote during its discussion of pretrial sureties. Gov't Br. 39 n.5.

argument is based on the flawed premises that most crimes were capital offenses at the founding and that criminal defendants were rarely released. Both are incorrect. Furthermore, pretrial detention does not burden Second Amendment rights in the same way as § 922(n).

*Most crimes were not capital offenses*
*at the founding.*

The Government's position that most indictees were detained at the founding rests entirely on its significant overstatement of the availability of capital punishment and, consequently, the prevalence of detention without bail at the time. While the Government vaguely references the ubiquity of capital crimes at common law, it offers few actual statutes to support the position. *See* Gov't Br. 33. The First Congress, for example, only recognized a select few felonies as capital. *See* Crimes Act, 1 Cong. Ch. 9, 1 Stat. 112 (1790). These were limited to treason, murder, certain piracy and felony on the high seas offenses, prison break for capital offenders, and counterfeiting. *Id*. Conversely, the Crimes Act enumerated far more crimes that were not capital, including: manslaughter, misprision of treason, accessory, interference with diplomatic immunity, passport obstruction, mayhem, perjury, obstruction, judicial bribery,

and property crimes such as larceny. *Id.* Virtually all these crimes were, like those subject to § 922(n), punishable by more than a year in prison, illustrating that they were considered "serious" but were nevertheless not capital. *Id.*

"Capital punishment was not as common a penalty in the American colonies" as in England, and the colonies recognized "far fewer" capital crimes. *See Furman v. Georgia*, 408 U.S. 238, 335 (1972) (Marshall, J., concurring). "[D]uring the period leading up to the founding, the connection between felonies and capital punishment started to fray." *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting). The colonies used the death penalty sparingly and, by the founding, states did not treat most felonies as capital. *Id.* New Hampshire, for example, explained in its constitution that "no wise legislature … will afix the same punishment to the crime of theft, forgery and the like, which they do to those of murder and treason[.]" *Harmelin v. Michigan*, 501 U.S. 957, 980 (1991) (opinion of Scalia, J.) (citing N.H. Const., Pt. I, Art. XVIII (1784)). Massachusetts excluded crimes like arson, burglary, and robbery from its list of capital offenses, even as early as the 17th century. *See* Donald B. Verrilli, Jr., *The Eighth Amendment and the Right to Bail: Historical Perspec-*

*tives*, 82 Colum. L. Rev. 328, 349 (1982) [Verrilli]. Indeed, the offense for which Sanchez was indicted in this case, robbery, was not generally capital at the time of the founding. *See Kanter*, <u>919 F.3d at 459</u> (Barrett, J., dissenting) ("property crimes including variations on theft, burglary, and robbery were, on the whole, not capital") (cleaned up).

The Government is simply wrong that the body of capital offenses from the founding serve as a comparable proxy for all felonies today. Assuredly, more crimes were capital at the founding than today. But most modern felonies that implicate § 922(n) were not capital at the founding.

*Criminal defendants were frequently released*
*pretrial at the founding.*

Because the Government misunderstands the prevalence of capital punishment at the founding, it misconstrues how frequently criminal defendants were detained without bail. Federal offenses that were not capital *required* bail. *See, e.g.*, Judiciary Act, <u>1 Stat. 73</u>, Sec. 33 (1789). Indeed, the Government acknowledges that bail was available to those accused of felonies and that almost every state entering the union adopted an explicit right to bail, a right that would be unnecessary if, as the Government posits, virtually

every offense was capital and every offender detained. *See* Gov't B<u>r. 34</u> (citing Verrilli at 351).

Many of those indicted for felonies today, and thus subject to § 922(n), would not have been detained without bail at the founding. Individuals charged with felonies in the 18th century were routinely released from custody pending trial. *See* William F. Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb. L. Rev. 33, 78–86 (1977) [Duker]; Matthew J. Hegreness, *America's Fundamental and Vanishing Right to Bail*, 55 Ariz. L. Rev. 909, 925–30 (2013) [Hegreness]; *cf.* Timothy R. Schnacke, *A Brief History of Bail*, Judges' J., 6 (Summer 2018) (explaining the American tradition of liberally releasing offenders pretrial). In Pennsylvania, for example, even as punishment grew harsher in the 18th century, bail "continued to be granted routinely" for most crimes including felony assault, trespass, robbery, burglary, sodomy, and even capital offenses and, "[i]ndeed, there is not an offense charged before the [quarter sessions] court during this period for which someone was not granted bail." Paul Lermack, *The Law of Recognizances in Colonial Pennsylvania*, 50 Temp. L.Q. 475, 497 (1976–77) [Lermack]. The American colonies distinguished themselves from the less liberal English bail tradition by disfavoring discretionary bail in favor of

compulsory bail for non-capital crimes. *See* Caleb Foote, *The Coming Constitutional Crisis in Bail: I*, 113 U. Pa. L. Rev. 959, 975–79 (1965) [Foote].

Even those accused of capital crimes were often released on bail. Scholars have identified "frequent instances of capital defendants, even those arrested for murder or treason, being released on bail before trial." Verrilli at 349; Duker at 102 (identifying instances shortly after the founding of bail granted for those charged with treason and piracy); *cf.* Lermack at 495–96 (explaining bail was sometimes granted in even the most serious cases in 18th century Pennsylvania, though not routinely granted as a matter of right). In 17th-century Massachusetts, "it was routine to release pending trial defendants charged with such serious and sometimes capital offenses as: burglary, theft, aggravated assault and battery, attempted rape, bigamy, fornication and bastardy …, arson, infanticide, manslaughter, and blasphemy." Foote at 981. Similar release practices were recorded in 17th-century New York for those charged with sedition, riot, treason, theft, and murder. *Id*. at 981–82.

The Government asserts, however, that, once *indicted*, capital defendants were generally unbailable by the 19th century. *See* Gov't

37

Br. 33–35. This was, however, not a uniform practice, as acknowledged in the Government's cited authority. *See* Thomas F. Davidson, *The Power of Courts to Let to Bail*, 24 Am. L. Reg. 1, 3 (1876) [Davidson] (noting many courts in the 19th century followed this English practice, but others did not in states like Indiana, Mississippi, and Ohio). Indeed, the scholarship cited above identifies several founding-era capital defendants who were released after being charged with or indicted for a crime. *See, e.g.*, Duker at 102.

Moreover, the Government ignores that founding-era indictments generally required far more proof and certainty of guilt than modern indictments. *See* Dr. Robert Schehr, *Standard of Proof, Presumption of Innocence, and Plea Bargaining: How Wrongful Conviction Data Exposes Inadequate Pre-Trial Criminal Procedure*, 54 Cal. W. L. Rev. 51, 72–75 (2017) (noting American grand juries at the founding and up to the early 20th century generally applied a stricter historical standard of proof closer to the trial burden, rather than the modern probable cause standard); William Ortman, *Probable Cause Revisited*, 68 Stan. L. Rev. 511, 519–21, 530–33 (2016). Thus, historically, courts could more readily rely on an indictment as significant evidence of a person's guilt supporting detention. *See* Davidson at 1–3. Regardless of whether an indictment for a capital

offense generally foreclosed pretrial release, such indictments are not meaningful proxies for modern indictments and, as discussed above, most modern crimes were not capital at the founding.

The Government fails to show a historical tradition to support its implicit theory that defendants subject to § 922(n) would have been automatically detained at the founding, and thereby disarmed. Its reasoning is vague, ahistorical, and ultimately irreconcilable with the framework applied in *Bruen*. *See* 142 S. Ct. at 2131–35.

> *Historical pretrial detention practices are not*
> *relevantly similar to § 922(n)*

The Government's pretrial detention argument also fails to satisfy *Bruen*'s "relevantly similar" standard.

The Government ignores *Bruen*'s directive to compare challenged statutes to the historical tradition of *firearm* regulation. *Id*. at 2130. The *Bruen* Court considered only firearm restrictions in its

historical analysis, *id.* at 2138–53, and none of the proposed histor-
ical analogues were as tenuously related to the challenged statute
as those offered here by the Government.[17]

Pretrial detention and § 922(n) do not comparably *burden* the
right of armed self-defense. *See id.* at 2133. Section 922(n) affects
those who have been *released*, not those who have been *detained*
pretrial. The need for armed self-defense is not the same while in
custody, where the State bears a duty to protect detainees. *See
DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189,
199–200 (1989). And, historically, only the narrow category of capi-
tal offenders was likely to be detained, while indictees for any state
or federal felony, specifically those adjudicated not to pose a flight
risk or danger, are subject to § 922(n). Even if detained populations
were not historically distinguishable from released populations, it
does not follow that the power to detain implies the power to impair
all constitutional rights. *See United States v. Scott*, 450 F.3d 863,

---

[17] *Bruen* rejected as historical analogues for the challenged may-issue
licensing regime: English and colonial "going armed" and "going armed
offensively" laws, English proclamations decrying the proliferation of
handguns, laws restricting concealed carry, surety statutes, and even a
law forbidding public carry without reasonable grounds to fear an attack.
142 S. Ct. at 2138–53.

866 n.5 (9th Cir. 2006) ("The right to keep someone in jail does not in any way imply the right to release that person subject to unconstitutional conditions"); *cf. Range*, 69 F.4th at 105 (holding the "greater" power to execute "does not necessarily include the lesser" power to disarm).

Section 922(n) and pretrial detention are also not comparably *justified*. *See Bruen*, 142 S. Ct. at 2133. Even assuming pretrial detention and § 922(n) serve the same safety purposes,[18] the safety justification for § 922(n) is overly broad compared to justifications for detaining defendants. Section 922(n) imposes criminal sanctions on even those accused of relatively minor and non-violent crimes, without any finding of dangerousness. Indeed, the statute impacts those who have been *released* pretrial, which means they have typically been found *not* to be dangerous at a bond hearing. Section

---

[18] Many scholars recognize that, until the 20th century, pretrial detention primarily served to ensure a defendant's appearance in court. *See* Lauryn P. Gouldin, *Disentangling Flight Risk from Dangerousness*, 2016 B.Y.U. L. Rev. 837, 845–50 (2016) [Gouldin]; Laurence H. Tribe, *An Ounce of Detention: Preventative Justice in the World of John Mitchell*, 56 Va. L. Rev. 371 (1970); Davidson at 2–3 (noting bail was rarely granted in capital cases where the evidence was strong "because no pecuniary consideration would induce a party, charged with a capital crime, who felt that there was a strong probability of conviction, to appear for trial").

922(n) is entirely inconsistent with the historical practice of detaining those accused of capital crimes.

### b. *Pretrial surety practices are not historical analogues for § 922(n).*

The Government next argues that historical practices of pretrial release, by bail or surety, provide support for § 922(n). Gov't Br. 37–40. Those practices did not restrict the possession or receipt of firearms. They are not *firearm* regulations, and they differ in purpose from § 922(n), focusing on the appearance of the defendant rather than any potential danger to the community. The mere use of bail or surety as part of pretrial release is in no way "relevantly similar" to § 922(n) under *Bruen*.[19]

———————————

[19] The Government at times conflates two distinct and unrelated concepts of pretrial surety and surety-of-the-peace. The Government asserts: "[s]ureties were also often required to ensure that the defendant 'kept the peace' until trial." Gov't Br. 38 (citing 4 William Blackstone 250, COMMENTARIES ON THE LAWS OF ENGLAND (1765)). The phrase "until trial," does not appear in the cited Blackstone section. It does not discuss *pretrial* sureties but sureties as a "Means of Preventing Offenses" if there is suspicion that a crime is likely to occur. 4 Blackstone ch. 18. Blackstone discusses pretrial sureties separately, in a chapter on "Commitment and Bail," which says nothing about "keeping the peace," but clarifies that

*Criminal defendants were historically released pretrial by bail or surety, not with nonfinancial conditions.*

Those accused of a crime could historically be released pretrial upon payment of bail or securing a surety. *See* John F. Duffy & Richard M. Hynes, *Asymmetric Subsidies and the Bail Crisis*, 88 U. Chi. L. Rev. 1285, 1299–1303 (2021); Hegreness at 916–31. A "surety" is somebody who is liable to pay another's debt or ensure performance of an obligation. *See* Surety, Black's Law Dictionary (11th ed. 2019). The use of bail or sureties was not limited to criminal defendants, and witnesses or parties to civil cases in early America were also often required to post bail or obtain a surety. *See, e.g.*, Lermack at 489–93, 499–502; Act of Feb. 15, 1791, ch. 74, 5 N.H. Laws 687–88 (H.H. Metcalf 1916); Horatio Marbury & William H. Crawford, DIGEST OF THE LAWS OF THE STATE OF GEORGIA at 296 (1802) (describing Act of Feb. 16, 1799, § 13). But the purpose of bail or surety through English and early American law was largely the same: to

---

the purpose of bail in the criminal context is to ensure appearance of the defendant. 4 Blackstone ch. 22. The Government elsewhere claims the "accused were … subjected to burdensome pretrial supervision by sureties of the peace," Gov't Br. 10, but offers no examples of "sureties of the peace" being used pretrial. Sanchez addresses surety-of-the-peace laws separately below. *See infra* Section D.3.e.

ensure a person's appearance in court. *See, e.g.*, Hegreness at 939–40.

The Government infers from the custodial authority granted to sureties that they must have been permitted to impose conditions of release or other restrictions on defendants. *See* Gov't Br. 37, 39. But the position is unsupported. The Government fails to cite to any specific statutes or laws and relies instead on generalized descriptions of surety practices across hundreds of years. The Government never identifies *any* purported restriction, much less a *firearm restriction*. Moreover, all but one of the Government's cites for this proposition involve English law. *See* Gov't Br. 37–39. *Bruen* requires the Government to identify specific laws, with those from the American founding providing the best evidence. 142 S. Ct. at 2132–34. The Government has not done so.

The Government's conclusion is also inconsistent with historical evidence. The surety's authority related solely to detaining a person and returning him or her to jail. *See, e.g.*, *Taylor v. Taintor*, 83 U.S. 366, 371 (1873); Lermack at 506; Duker at 70–77; Alexa Van Brunt & Locke E. Bowman, *Toward a Just Model of Pretrial Release: A History of Bail Reform and a Prescription for What's Next*, 108 J. Crim. L. & Criminology 701, 714 (2018) [Van Brunt]; *see also*

Charles Petersdorff, A PRACTICAL TREATISE ON THE LAW OF BAIL IN CIVIL AND CRIMINAL PROCEEDINGS 514–18 (1824) (discussing English tradition). Indeed, the case the Government cites confirms that the "rights of the bail in civil and criminal cases are the same," and thus conditions were specifically related to appearance in court. *Taylor*, 83 U.S. at 372. Pretrial release varied only in the amount of bail or the number of sureties required, not the existence of additional conditions of release. *See* Lermack at 504. The surety role was analogous to that of a bail bondsman, not a modern pretrial officer or court. *Cf.* Hegreness at 939; Laura I. Appleman, *Justice in the Shadowlands: Pretrial Detention, Punishment, & the Sixth Amendment*, 69 Wash. & Lee L. Rev. 1297, 1329 (2012) ("the personal surety system eventually morphed into the commercial bondsman system"); Betsy Kushlan Wanger, *Limiting Preventive Detention Through Conditional Release: The Unfulfilled Promise of the 1982 Pretrial Services Act*, 97 Yale L.J. 320, 324 (1987) (same).

Non-monetary conditions of pretrial release are a late 20th century innovation that accompanied a shifting focus towards community safety rather than court appearance. *See* John S. Goldkamp, *Danger and Detention: A Second Generation of Bail Reform*, 76 J.

Crim. L. & Criminology 1, 12 (1985) [Goldkamp] (describing conditional release provisions as products of the bail reform movement of the 1960s and 70s); Van Brunt at 759 n.313 (discussing pretrial services model of non-monetary conditions as a component of third-wave bail reform efforts); *cf.* Timothy R. Schnacke, Michael R. Jones, & Claire M.B. Brooker, *The History of Bail and Pretrial Release*, Pretrial Justice Institute, at 17 (Sept. 23, 2010) (explaining that the Bail Reform Act of 1984 arose in part from frustrations with the prior inability of a judge to impose release conditions related to the risk to the community).

*Pretrial sureties are not relevantly similar to § 922(n).*

Historical practices of pretrial release by bail or surety are not "relevantly similar" to § 922(n). Much like detention, sureties are not firearm restrictions, so they are not a proper analogue under *Bruen*. *See supra* Section D.3.a. And, unlike detention, there is no evidence that pretrial release in any way impaired firearm rights historically.

The Government does not assert that surety practices imposed any burden *on the right to bear arms*, as required to show a "rele-

vantly similar" historical analogue for Second Amendment purposes. *See Bruen*, 142 S. Ct. at 2132–33. Pretrial firearms restrictions did not arise until the late 20th century. Because pretrial release historically had no meaningful impact on a person's Second Amendment rights, historical bail and surety practices share virtually no features with § 922(n), and certainly do not comparably burden the firearm right.

As for whether the practice is comparably *justified*, the Government does not specifically compare § 922(n) to pretrial surety practices. It elsewhere asserts generally that pretrial liberty restrictions on criminal defendants historically served the purposes of securing the attendance at trial *and* protecting the public. Gov't Br. 31. This is untrue. Section 922(n)'s passage was motivated by community safety purposes, but not flight risk concerns. *See Laurent*, 861 F. Supp. 2d at 82–84.

Conversely, there is little evidence to suggest that pretrial surety practices around the founding were motivated by community safety interests. Rather, as noted above, the purpose of pretrial sureties around the founding was to ensure a person's appearance in court. *See, e.g.*, *Ex parte Milburn*, 34 U.S. (9 Pet.) 704, 710 (1835); Lermack at 486–93, 499–502; Lauryn P. Gouldin, *Disentangling*

*Flight Risk from Dangerousness*, 2016 B.Y.U. L. Rev. 837, 845–47 (2016) [Gouldin]; Goldkamp at 15. This is particularly clear because sureties and bail were used for witnesses and parties in civil cases as well. *See* Lermack at 489–93, 499–502. Even into the early 20th century, the sole recognized function of bail was securing the appearance of the accused. *See Stack v. Boyle*, 342 U.S. 1, 4–5 (1951); Van Brunt at 731–32. The use of detention to address danger to the community was a novel feature of laws like the District of Columbia Court Reform and Criminal Procedures Act of 1970 and the Bail Reform Act of 1984, which departed from the traditional limitation of bail to prevent flight risk. *See generally* Michael Harwin, *Detaining for Danger Under the Bail Reform Act of 1984: Paradoxes of Procedure and Proof*, 35 Ariz. L. Rev. 1091 (1993); *see also* Goldkamp at 4–6, 15–16; Van Brunt at 732–33. Unlike historical financial conditions—like bail—modern non-financial conditions—like those on firearms—address modern concerns about community risk. *See* Gouldin at 895–97 (comparing conditions that manage flight risk to those that mitigate danger).

The Government fails to show that pretrial surety practices are "relevantly similar" to § 922(n) on either "how" or "why" they burden Second Amendment rights. *See Bruen*, 142 S. Ct. at 2133.

   c. *The practice of disarming a person while under arrest*
      *is not a historical analogue for § 922(n).*

The Government next argues that the "common law of arrest" is a "historical precursor to Section 922(n) [.]" Gov't Br. 40–41. But the practice of temporarily disarming individuals who are actively under arrest is not "relevantly similar" to § 922(n).

The Fourth Amendment cases cited by the Government rest on an obvious premise: when a person is arrested and has a firearm on them, police do not permit that person to keep that firearm while in custody, processing, and jail. *See Agnello v. United States*, 269 U.S. 20, 30 (1925); *Chimel v. California*, 395 U.S. 752, 762–63 (1969). The cases clarify that searching for weapons incident to arrest prevents their use to resist arrest or escape from custody. *See Chimel*, 395 U.S. at 762–63. The cases do not address the Second Amendment. Nor are they the type of specific historical evidence required by *Bruen*. None of the cases suggests that arrestees have historically been more broadly deprived of firearms in their homes, that their disarmament persisted past their release from custody, or that they were not permitted to obtain additional firearms once released. *Cf. id.* at 763–64 (limiting the search-incident-to-arrest principle to the immediate vicinity of the arrestee at the time of the arrest).

The Government cites one Second Amendment case, an Arkansas plurality opinion upholding a concealed weapons prohibition. *See State v. Buzzard*, 4 Ark. 18 (1842). The opinion notes in dicta that arrestees have historically been divested of their arms. *Id.* at 21. It does not provide further historical evidence for the practice and, likewise, does not assert that such disarmament extended beyond the time the person was in police custody. *Buzzard* also reflects a limited view of the Second Amendment right that was overruled by modern cases like *Heller* and *Bruen*. *See Young v. Hawaii*, 896 F.3d 1044, 1056–58 (9th Cir. 2018) ("Yet, with *Heller* on the books, cases in *Buzzard*'s flock furnish us with little instructive value."); Michael Waldman, THE SECOND AMENDMENT: A BIOGRAPHY 68 (2014) (describing the collective rights view of the Second Amendment, ultimately rejected in *Heller*, as the "Arkansas doctrine," exemplified by *Buzzard*).

The arrest practice is not "relevantly similar" to § 922(n). It does not pose a comparable *burden* on the Second Amendment right. *See Bruen*, 142 S. Ct. at 2133. Section 922(n) imposes criminal sanctions for a person receiving a firearm while under indictment for any state or federal felony. A person can be subject to the restriction for years. An arrestee, on the other hand, is simply not permitted

to carry a firearm on their person during the time they are under arrest, a period which would typically last hours or days unless they are ordered detained further. *See, e.g.*, Fed. R. Crim. P. 5(a)(1)(A) (requiring an arrestee to appear before a judge "without unnecessary delay"). After that point, a person would either be released pretrial or further detained, as addressed above. *See supra* Section D.3.a.

Nor is § 922(n) comparably *justified* to the practice of disarming those under arrest. *See Bruen*, 142 S. Ct. at 2133. A person in police custody, like any person on more prolonged pretrial detention, has a reduced need for armed self-defense. *See supra* Section D.3.a. And the prospect of arrestees or detainees carrying firearms while in a jail or in the back of a police car presents unique dangers and safety concerns entirely dissimilar to a person obtaining a firearm while released to the general public. *Cf. Bell*, 441 U.S. 546–47 (discussing unique need to maintain institutional security in carceral setting).

The requirement that arrestees cannot bring their firearms into a jail is in no way comparable under *Bruen* to an often years-long § 922(n) impairment of a person's Second Amendment rights, which is enforceable by imprisonment.

>    d. *A purported tradition of disarming dangerous or un-*
>    *trustworthy people does not provide historical support*
>    *for § 922(n).*

The Government also argues that an ill-defined history of dis-
arming "dangerous or untrustworthy" people supports § 922(n)'s
constitutionality. Gov't Br. 41–48. The Government argues that his-
torical categorical restrictions against groups bearing no relation to
indictees support a finding that *any* "dangerous or untrustworthy"
person can be disarmed. The Government includes as support:
(1) "going armed" laws; (2) laws disarming those who refused to
swear allegiance; (3) rejected proposals during ratification debates
to limit the Second Amendment; (4) laws disarming minorities; and
(5) a general principle of disarming "unvirtuous citizens." Gov't Br.
41–48. The Government improperly groups these disparate re-
strictions together to manufacture a robust tradition of similar fire-
arm regulation. Moreover, much of its evidence has already been
rejected as ahistorical or dubious by this Court. *See Rahimi*, 61
F.4th at 456–61. The Government's arguments are unavailing.

*"Going armed" laws*

The Government identifies a tradition in the colonies of prohib-
iting "going armed offensively." Gov't Br. 42. These laws are entirely

dissimilar to § 922(n) because they criminalize conduct, not categories of people. *See Bruen*, 142 S. Ct. at 2144–45 (rejecting comparison to these laws). This Court has also rejected reliance on the same laws. *Rahimi*, 61 F.4th at 457–59. *Rahimi* did not just find that "going armed" laws were insufficiently analogous to § 922(g)(8), it explained "it is doubtful these 'going armed' laws are reflective of our Nation's historical tradition of firearm regulation, at least as to forfeiture of firearms." 61 F.4th at 458. As *Rahimi* explained, the cited laws *did not* include forfeiture provisions or removed their forfeiture provisions. *See id.* For similar reasons, they are not adequate analogues here.

Because these laws do not reflect the "Nation's historical tradition of firearm regulation," they are not properly relied on in any Second Amendment challenge. *See Bruen*, 142 S. Ct. at 2126.

### Laws disarming those who refused to swear allegiance

The Government next relies on Revolution-era laws confiscating weapons from those who refused to swear an oath of allegiance. Gov't Br. 43–44. The Government reasons that this type of disarmament, as well as the disarming of religious minorities like Catholics, demonstrates that even non-violent individuals could be disarmed

if they showed disrespect for the rule of law. *Id.* (citing the vacated panel opinion, *Range*, 53 F.4th at 279). But, again, the Government does not explain, except at the highest levels of abstraction, how those under indictment are similar to political or religious dissidents.

The Second Amendment was a repudiation of disarming political opponents. *See Heller*, 554 U.S. at 592–95, 598; *Hicks*, 2023 WL 164170, at *5 ("disarmament of the politically disloyal is the very tyranny the Second Amendment sought to deter"). The laws cited by the Government were not first adopted during the American Revolution but had previously been imposed on colonial Americans who refused to swear allegiance to the English crown. *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 157–61 (2007) [Churchill]. The Government no longer expressly cites English laws like the Militia Act of 1662. *Compare* ROA.10–11 *with* Gov't Br. 41–42. But it still cites to the same English tradition of disarming political dissidents, *see* Gov't Br. 41, 43–44, which is not a "forerunner of our Nation's historical tradition of firearm regulation." *Rahimi*, 61 F.4th at 456. Even "'traitors' unwilling to swear

allegiance to the Crown retained their weapons in colonial America." *Hicks*, 2023 WL 164107, at *5.

### Proposals from ratification debates

The Government next argues that disarming select groups is consistent with proposals raised during ratification debates to limit the right to peaceable citizens. Gov't Br. 44–45. This Court has already foreclosed reliance on these proposals because they did not become part of the Second Amendment. *Rahimi*, 61 F.4th at 457; *see also Heller*, 554 U.S. at 603 (noting it was "dubious" to rely on this history); *Kanter*, 919 F.3d at 454–56 (Barrett, J., dissenting); *Hicks*, 2023 WL 164107, at *5 (rejecting this argument in § 922(n) case).

### Laws disarming minorities

The Government next cites favorably to the founding-era disarming of "Native Americans, Black people, [ ] indentured servants," and religious minorities as evidence of a historical tradition of disarming "dangerous and untrustworthy" people. Gov't Br. 43. The disarmament of oppressed communities is the most consistent species of categorial firearm regulation from the colonial era to the 19th century. *See* Greenlee at 269–70; Churchill at 156–58; *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting).

But the Government's reliance on these laws is misplaced. It does not explain how disarming minorities is similar to disarming indictees. *See Range*, 69 F.4th at 105 (citing *Bruen*, 142 S. Ct. at 2134) (rejecting the analogy of § 922(g)(1) to these laws as "far too broad"). And the fact that disarming minorities is so plainly unconstitutional defeats its argument. *See Bruen*, 142 S. Ct. at 2131 (explaining that analogous regulations found to be unconstitutional is evidence of unconstitutionality), 2149 (rejecting reliance on surety laws enforced only pretextually against black Americans), 2150–51 (describing efforts to disarm freed slaves as violating their right to keep and bear arms). One district court recently characterized similar arguments as citing to "historical travesties to support taking someone's Second Amendment rights today" and cautioned against permitting the Government to label disfavored communities "unvirtuous" to justify restricting their rights. *See Hicks*, 2023 WL 164170, at *6.

This Court has also explained that the utility of these laws as "historical analogues is … dubious, at best," because these laws disarmed those who were excluded from "the people" protected by the Second Amendment altogether. *Rahimi*, 61 F.4th at 457. Indictees, on the other hand, are not excluded from "the people" protected by

the Constitution. *See supra* Section C. The laws were not just dissimilar to § 922(g)(8); the Court counseled against reliance on them at all.

*Disarmament of "unvirtuous citizens"*

Finally, the Government argues that scholars have identified that the right to bear arms has historically been tied to the concept of "virtuous citizenry," which it reasons excludes those under indictment. Gov't Br. 45–48. This "virtuous citizen" theory lacks historical support. *See* Greenlee at 275–83. The earliest articles promoting the theory fail to cite to any historical evidence. *See id.* Rather, historical categorical disarmament was generally limited to disempowered minority communities—like slaves and Native Americans— and those who evidenced disloyalty to the government. *See id.* at 261–65; Churchill at 156–61. One court has already explained the historical abuses and obvious dangers in relying on this virtuous citizen theory. *See Hicks*, 2023 WL 164170, at *6 (explaining how the theory has been used to disarm minorities and could similarly be abused today).

Those restrictions are not only troubling, but they also provide no remote analogue to indictees. Indeed, the Government's reliance on such an amorphous categorization seems to invite the kind of

57

deference to legislatures expressly rejected in *Bruen*. *See* Gov't Br. 46 (noting the "broad discretion" of legislatures to determine what individuals are sufficient threat to warrant disarmament); *see also Bruen*, 142 S. Ct. at 2131 (rejecting deference to legislatures on firearm regulations); *cf. Medina*, 913 F.3d at 159–60 (rejecting the "dangerousness standard" as too "amorphous … to delineate the scope of the Second Amendment").

### e. *Surety-of-the-peace laws are not historical analogues for § 922(n).*

In the district court, the Government also cited to 19th-century surety-of-the-peace laws that purportedly required certain individuals to forfeit arms until they paid a surety. ROA.83–85; *see also* Gov't Br. 39 n.5. These surety-of-the-peace laws are of limited historical value and not sufficiently similar to § 922(n).

Surety-of-the-peace is a distinct type of surety, which, unlike pretrial sureties, serves to deter *future* misconduct. *See, e.g.*, Lermack at 502–04; *supra* n.19. There is some evidence that certain surety-of-the-peace laws could condition public firearm carry on a surety, after a credible fear of future danger was raised. *See Bruen*, 142 S. Ct. at 2148.

The Government referenced 19th-century laws of this type in the district court. ROA.84. But *Bruen* explained that these statutes were of limited historical value because of a dearth of evidence that authorities ever enforced them, except pretextually against black defendants. 142 S. Ct. at 2149. The Court further noted that it is the Government's burden to show otherwise, and so it considered "the barren record of enforcement to be simply one additional reason to discount their relevance." *Id.* at 2149 n.25. Even if this Court could rely on these 19th-century laws, they are entitled to less weight than laws from the founding. *See Bruen*, 142 S. Ct. at 2136–37, 2163 (Barrett, J., concurring); *see also United States v. Stambaugh*, __ F. Supp. 3d __, 2022 WL 16936043, at *4 (W.D. Okla. Nov. 14, 2022) (rejecting reliance on these laws in § 922(n) case for this reason).[20]

---

[20] The Government has in other cases proffered evidence of *colonial* surety-of-the-peace laws for the same purpose. *See* Appellant Brief 43–44, *United States v. Quiroz*, No. 22-50834 (5th Cir. Dec. 30, 2022). The Government appears to have recognized its error, as noted by counsel in that case, because most of these laws said nothing at all about firearms. *See* Appellee Brief 47–49, *United States v. Quiroz*, No. 22-50834 (5th Cir. Jan. 23, 2023).

Moreover, such statutes are not relevantly similar to § 922(n). This Court has already rejected reliance on surety-of-the-peace laws as analogues for § 922(g)(8). *Rahimi*, <u>61 F.4th at 459</u>–61. *Rahimi* acknowledged key similarities between the laws and § 922(g)(8)—both protected an identified person from a specific individual and relied on a civil proceeding not a criminal conviction. *Id*. at 459–60. Still, the Court found § 922(g)(8) more burdensome because the impairment in surety-of-the-peace laws could be overcome by posting a surety. *Id*. at 460.

These laws are plainly more similar to 922(g)(8) than they are to § 922(n). They suffer from the same shortcoming in comparison to § 922(n)—that the deprivation could be overcome by posting a surety. But § 922(n) shares none of the features identified in *Rahimi*, such as the protection of a specific individual and the civil process. Section 922(n) makes it a crime for any indicted person to receive a firearm without any "specific showing of reasonable cause to fear an injury, or breach of the peace," *see Bruen*, <u>142 S. Ct. at 2148</u>, or other process. Section 922(n) imposes a greater burden on individuals' firearm rights than these surety-of-the-peace statutes with fewer procedural protections.

* * *

Because the Government failed to identify any "distinctly similar" or "relevantly similar" laws from the founding that demonstrate a broad tradition of firearms restrictions like § 922(n), it has failed to meet its burden.

### E. The district court correctly held that § 922(n) is facially unconstitutional.

1. Section 922(n) facially violates the Second Amendment under the framework announced in *Bruen*.

The Government argues that the district court erred in finding § 922(n) *facially* unconstitutional. Gov't Br. 48–51. It reasons the court improperly applied the *Salerno* facial standard because "[a]t least some applications of § 922(n) surely violate no Second Amendment rights." Gov't Br. 50; *see also* Gov't Br. 10–11. The Government misunderstands the standard for facial challenges, and its argument is foreclosed.

This Court rejected this argument in *Rahimi*. The Court noted that *Bruen* was itself a facial challenge and made clear that "if a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances." *Rahimi*, 61 F.4th at 453. Facial challenges consider only whether the text of the challenged statute is inconsistent with the Second

Amendment's text and historical understanding. *Id.*; *see also Free-dom Path, Inc. v. Internal Revenue Serv.*, 913 F.3d 503, 508 (5th Cir. 2019) ("A facial challenge to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual." (cleaned up)).[21]

Even were this Court to apply *Salerno*, the Government miscon-strues its requirement that a facial challenge show "that the law is unconstitutional in all of its applications." 481 U.S. at 745. Courts consider only "applications of the [challenged] statute in which it actually authorizes or prohibits conduct," not circumstances for which the statute is irrelevant. *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 415–19 (2015). The Government's purported "applica-tions"—escaping from jail or purchasing an illegal weapon—are not "actually … prohibited" by § 922(n). *See* Gov't Br. 50. They are un-related criminal acts that are irrelevant to and have no bearing on the constitutionality of the statute. As in *Patel*, the Government's

---

[21] The Supreme Court has also not strictly adhered to the *Salerno* standard. For example, in the unconstitutional vagueness context, the Supreme Court has recognized that a statute need not be vague in every application to be facially struck down. *See Johnson v. United States*, 576 U.S. 591 (2015).

framing would "preclude facial relief in every" Second Amendment challenge. 576 U.S. at 418. *Bruen* itself could not have been decided as it was under the Government's understanding of the facial standard.

The district court—applying the analysis laid out in *Bruen* and affirmed in *Rahimi*—correctly found that § 922(n) facially violates the Second Amendment.

### 2. The district court did not plainly err by analyzing § 922(n) facially.

The Government also argues that the district court erred by striking § 922(n) down facially rather than first determining it was unconstitutional as applied to Sanchez. Gov't Br. 48–51. The Government's argument, raised for the first time on appeal, is incorrect.

Because the Government did not raise this issue with the district court, it is subject to plain-error review. For this Court to reverse, the Government must show (1) an error, (2) that is plain— "clear and obvious"—and (3) affects the appellant's substantial rights. *United States v. Olano*, 507 U.S. 725, 732–34 (2009). If the first three prongs are satisfied, then this Court may remedy the error if it seriously affects the fairness, integrity, and public reputation of the judicial proceedings. *Id.* at 736.

The district court did not plainly err. The Government's cited cases say only that courts "generally decide" as-applied challenges first, but do not require it. Gov't Br. 49 (citing *Buchanan v. Alexander*, 919 F.3d 847, 853 (5th Cir. 2019)). And it has not identified any cases that found reversible error where the district court struck down a statute facially rather than as applied. *See United States v. Hill*, 35 F.4th 366, 396 (5th Cir. 2022) (holding the "lack of binding authority is often dispositive in the plain-error context").

Even if the district court erred, the error did not affect the Government's substantial rights, because § 922(n) is unconstitutional as applied to Sanchez. *See United States v. Avants*, 278 F.3d 510, 521–22 (5th Cir. 2002) (substantial rights are only affected if the error affected the outcome of the district court proceedings). Because the district court found § 922(n) unconstitutional on its face, the statute is necessarily unconstitutional as applied to Sanchez as well. *See Green v. U.S. Dep't of Just.*, 54 F.4th 738, 744 (D.C. Cir. 2022) (explaining that facial unconstitutionality resolves as-applied claims).

Because any error was harmless, the Government cannot show it affected its substantial rights as required under plain error review. *See* Fed. R. Crim. P. 52(a), (b). Nor can it show that any such

error seriously affected the fairness, integrity, and public reputation of the judicial proceedings. *Olano*, 507 U.S. at 736; *see also United States v. Castillo*, 386 F.3d 632, 637–38 (5th Cir. 2004). The district court did not plainly err by addressing the facial challenge without first addressing the as-applied challenge.

## Conclusion

For these reasons, this Court should affirm the district court's dismissal of the indictment.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Timothy M. Shepherd
TIMOTHY M. SHEPHERD
Assistant Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206
(210) 472-6700
(210) 472-4454 (Fax)

*Attorney for Defendant-Appellee*

**Certificate of Compliance with Type-Volume Limit**

1. This document complies with the word limit of <u>Fed. R. App. P. 32(a)(7)(B)</u> because, excluding the parts of the document exempted by <u>Fed. R. App. P. 32(f)</u>, this document contains 12,998 words.

2. This document complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and the type-style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook.

<u>s/ Timothy M. Shepherd</u>
TIMOTHY M. SHEPHERD
*Attorney for Defendant-Appellant*

Dated:  June 23, 2023
